# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-1459

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THOMAS G. ADCOCK, JR.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 04-CR-30065—**Jeanne E. Scott**, *Judge.*

_____

ARGUED JANUARY 16, 2008—DECIDED JULY 16, 2008

_____

Before MANION, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* For at least a decade, Thomas Adcock, Jr., worked for a nonprofit corporation in Pana, Illinois, that provides housing for persons of low income and senior citizens. His company, the Housing Authority of Christian County ("HACC"), received most of its funds from the federal government. Adcock ran into trouble when, in his capacity as Maintenance Supervisor for one facility, he orchestrated a contract for painting the individual units and failed to disclose his own substantial economic interest in that contract. When his involvement in the company to which the contract had been

awarded came to light, he was indicted and charged with six counts of wire fraud, three counts of theft of government funds, three counts of embezzlement of government funds, two counts of submitting false documents, and one count of making a false statement. See 18 U.S.C. §§ 1343, 666A, 641, and 1001. The government dismissed the embezzlement counts, but a jury found Adcock guilty on the remaining 12 charges. The district court sentenced him to 21 months in prison and ordered him to pay $41,174.09 in restitution. We affirm.

**I**

HACC operates housing facilities throughout Christian County, Illinois; it relies primarily on funds from the U.S. Department of Housing and Urban Development ("HUD"), some of which come in the form of a monthly subsidy and others as particular grants. Among its funding sources is a capital grant that requires it to create a five-year plan for the maintenance of its facilities. Like other federal grantees, HACC must follow certain federal rules about spending. Of particular importance for this case are HUD's conflict-of-interest regulations, which require grantees to avoid conflicts in the award and administration of contracts. No employee, officer, or agent of a grantee may participate in the selection, the award, or the administration of a contract supported by federal funds if a conflict of interest (either direct or indirect) would be involved. These rules appeared, among other places, in a series of employee handbooks that HACC published in 1993, 1996, and 2000. HACC gave copies of these handbooks to its employees.

Adcock first began working for HACC in 1994, when he was hired to be the live-in custodian for a facility

called Pana Towers. In 1997, he was promoted to the position of Maintenance Supervisor for HACC. In this new job, he worked with HACC's Executive Director, Reva Woolard, her successor, Richard Deere, and the Board of Commissioners of HACC. As Maintenance Supervisor, Adcock was responsible for deciding which maintenance projects needed to be included in the five-year plan. The plan itself was revised every year and was subject to HUD approval. After a plan received HUD approval, HUD funded it by allocating accounts on which HACC was authorized to draw to pay invoices. The payments were accomplished through wire transfers of funds from the United States Treasury to HACC's bank account in Pana, Illinois.

From time to time, HUD evaluated the condition of the apartment units that it was subsidizing. In the course of these evaluations, it criticized HACC for failing to keep up with painting its occupied units. Adcock passed this criticism along to Woolard and told her that his staff was too busy to undertake the painting. He recommended that the project should be awarded to an outside contractor, after a bidding process. Woolard agreed to do so.

When HACC opened the bids in March of 1999, one of the lowest that it found was from a company then called "A-1 Maintenance." (Later, the company changed its name to A+ Maintenance, but we refer to it as A-1.) Adcock told Woolard and the Assistant Executive Director that A-1 had been created by Naidean Miller, a person who had done other community service projects for HACC. Adcock did not mention that he was actually the person who had written and submitted the bid in the name of A-1 Maintenance. He also made no mention of the fact that he had signed the name of his son, Justin,

to the contract before he showed it to Miller. The bid
from A-1 listed three references: Adcock himself, Dale
Myers (Adcock's father-in-law), and Jim Dressen, an
employee in HACC's maintenance department who was
not aware that his name was being used. Indeed, Dressen
and a few other employees had asked Adcock if they
could bid on the project, but he told them that, as em-
ployees, they were ineligible.

When the A-1 contract was presented to the Board of
Commissioners for its approval on March 30, 1999,
Woolard recommended that it be accepted. Adcock was
present at that meeting. In response to a question from a
Board Member, he falsely represented that Miller was
the owner of A-1. He said nothing about the fact that
either he or any of his family members might have an
interest in the arrangement. Under the contract, A-1
agreed to the following schedule of payments: $190 for
painting an efficiency apartment; $390 for painting a
one-bedroom apartment; and $490 for painting a two-
bedroom apartment.

After the Board awarded the contract to A-1, Adcock
told Miller that his son, Justin, had won the contract, and
that Justin wanted to hire her to perform the actual paint-
ing. She signed a paper agreeing to work as a subcon-
tractor for Justin. Under that agreement, Miller agreed
to accept $190 for painting a one-bedroom apartment
(giving "Justin" a nice $200 profit for that work) and
$240 for a two-bedroom apartment ($250 less than the
amount specified in the A-1 contract). Over the next
two years, Miller painted approximately 132 units for
HACC. Adcock told her which ones to do, and she
then reported back to him, listing the units she had com-
pleted. She was paid by checks signed in the name of

Justin Adcock, although she dealt only with defendant Thomas Adcock. Justin was vaguely aware of what was going on. He painted a few units; he opened a bank account in the name of A-1 at his father's request; but otherwise he paid no attention to the company, since he was away at college. Woolard at one point wondered what Justin was doing, because Justin's name appeared on the contract and the insurance certificate. Adcock told her that Justin was just helping out Miller, who could not obtain insurance in her own name.

Adcock personally typed and submitted all of the invoices for A-1's work to HACC. When he submitted an invoice, HACC's bookkeeper first ensured that it was approved, and then took the necessary steps to draw the funds from HUD. After the funds were wire-transferred from HUD to HACC's bank account, the bookkeeper cut a check payable to A-1. Adcock would then pick up that check and deposit it in the bank account that Justin had opened for A-1 (to which only Adcock had access). From April 1999 through March 2001, HACC paid A-1 $73,060; out of that total, Adcock paid Miller $27,500. The remaining $45,000 represented his profits from the deal, although he urges us to recall that he was performing some administrative functions for A-1 and thus some of that money was remunerative.

Near the end of 2000, all of HACC's contractors had to submit a certificate to the U.S. Department of Labor attesting that they were complying with all applicable regulations. Adcock prepared and signed each certificate on file for A-1; his forms did not reflect that he or any of his family members were involved with the contract. Instead, the forms continued the fiction that Miller was the owner of A-1. Miller never saw those forms.

In March 2001, the Board of Commissioners learned from some anonymous letters that Adcock was the true owner of A-1. The Board called him in to address both a double-billing issue and the alleged conflict during an executive session, but he denied having any financial interest in the business. Deere, by then Executive Director, instructed the bookkeeper to make future payments to "Naidean Miller Painting." Shortly thereafter, Adcock presented an invoice for $6,660, dated March 30, 2001, in the name of A-1 Maintenance. The bookkeeper processed the invoice, but as instructed she made the check payable to "Naidean Miller Painting." Knowing that Miller was in the building that day, she took it personally to Miller. Miller was surprised in every way: she knew nothing of the invoice, thought that the amount was very high, and refused to accept the check. Minutes later, Adcock picked up the check and asked Miller to come to his office. There he asked her if she would sign the check over to him, and she did. Not long thereafter, Miller took over the contract in earnest for a short time. Happy to be earning so much more money, she performed under the terms of the A-1 contract until May or early June 2001, when the contract was cancelled by HACC.

## II

Adcock challenges both his conviction and his sentence on appeal. He asserts that the evidence on the wire fraud counts was insufficient in two ways: first, it did not demonstrate that he acted knowingly or intentionally to defraud HACC, and second, the government failed to prove that he "knowingly caused" a wire transmission. His sentence was too high, he contends, because

the court should have used the prices specified in the A-1 contract as the best evidence of the market value of the services that actually were rendered to HACC. He also argues for other offsets, and he claims that the court miscalculated the amount of restitution.

A

In *United States v. Ratliff-White,* we held that "[a] defendant commits wire fraud under 18 U.S.C. § 1343, if she: (1) participates in a scheme to defraud; (2) intends to defraud; and (3) causes a wire transmission in furtherance of the fraudulent scheme." 493 F.3d 812, 817 (7th Cir. 2007). In his challenge to his convictions on the six wire fraud counts, Adcock does not argue that the evidence failed to support the first of those elements. He claims, however, that the government did not meet its burden of proving the second or third. We address these two points in turn.

Adcock's primary support for the proposition that he could not have acted with the requisite knowledge or intent to defraud is essentially that HACC was a hotbed of conflicts of interest, and in the face of such widespread malfeasance, he (a mere Maintenance Supervisor) would have had no way of knowing that his use of A-1 was impermissible. His brief details a depressing tale of nepotism and self-dealing at HACC, but it also demonstrates that this evidence was all before the jury. So, on the one hand, the jury learned that Woolard regularly granted contracts for the purchase of paint to a hardware store partly owned by her husband; that Deere (the later Executive Director) regularly conducted business with People's Bank, for which his son was a controller; that the chair of HACC's Board of Commissioners also served on

the Pana City Council as an elected official; that bidding procedures were regularly mismanaged; and more. On the other hand, the jury could infer that Adcock had the employee handbook setting forth the conflict-of-interest rules from the evidence showing that it was distributed to all employees; it heard that Adcock had informed his own employees that they were not eligible to bid on the painting contract; it learned that Adcock repeatedly misrepresented to the Board the precise relationship between Miller, his son Justin, and A-1 Maintenance; and it saw that Adcock filled out the Department of Labor certificates and failed to disclose his family's interest in the contract.

When reviewing a challenge to the sufficiency of the evidence, our task is not to see whether there is some evidence that might have supported an acquittal; it is to decide whether there is any evidence from which the jury could have found guilt beyond a reasonable doubt. See *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997). From that perspective, we have no trouble concluding that the jury's verdict was adequately supported.

The jury was not required to accept Adcock's argument that the permissive atmosphere of HACC rendered him unaware of the HUD regulations or of HACC's own policies on conflicts of interest. The evidence we have just reviewed about the handbook, Adcock's advice, and his lies amply supports the opposite conclusion. Adcock has offered no reason why the jury would not have been entitled to credit those items of evidence and to draw negative inferences against Adcock from his extensive efforts to conceal the true nature of his involvement with A-1. We could review more of the evidence, but this is enough to show that the jury's finding that Adcock intended to defraud HACC was supported by the evidence.

Adcock's attack on the third element required for a wire fraud conviction—that he caused a wire transmission in furtherance of the scheme—takes too narrow a view. The government is entitled to prove this element either by showing that the defendant himself personally performed the wire transfer or (more commonly) that he acted with knowledge that the use of a wire would follow in the ordinary course of business or that such use could reasonably be foreseen. As we noted in *Ratliff-White,* "[a] defendant can 'cause' a wire transmission without personally sending a transmission." 493 F.3d at 817 (citing *Am. Auto. Accessories, Inc. v. Fishman,* 175 F.3d 534, 542 (7th Cir. 1999); *United States v. Alexander,* 135 F.3d 470, 474 (7th Cir. 1998)). The government argues that its evidence here showed that the use of the wires was reasonably foreseeable to someone in Adcock's position.

The evidence showed that Adcock, as Maintenance Supervisor, was responsible for working with the Board to develop the five-year plan, which HACC updated every year and which HUD funded. As we noted earlier, once HUD approved the plans, it allocated accounts to fund them; HACC was then able to draw on those accounts to pay invoices as they were received. The draws were accomplished through a series of wire transfers. The question is whether these wire transfers were reasonably foreseeable to Adcock. A reasonable person certainly would have foreseen the need to create some manner of transferring money from HUD, located in Washington, D.C., to HACC, located in central Illinois. The days of Pony Express riders galloping across the countryside with large satchels of cash are long gone. Shipping cash by railroad or truck over such a distance is only slightly less foolhardy. Even if HUD had mailed U.S. Treasury

checks to HACC in Illinois, those checks would have had to clear by means of the wires through the interbank system, before the funds reached an account in Pana. Here, the jury knew that Adcock was instrumental in developing the five-year plans, that he held a supervisory position at HACC, and that he submitted A-1's invoices to HACC and waited to hear if the funds had cleared. This is enough, we believe, to permit the jury to find that the use of the wires was reasonably foreseeable to Adcock. Given the standard of review that binds us, we must reject both of his challenges to the sufficiency of the evidence.

B

With respect to his sentence, Adcock asserts that the district court miscalculated the amount of loss for which he is responsible under U.S. Sentencing Guideline § 2B1.1, and that the loss calculation should also be reduced for purposes of the restitution order. The government responds that Adcock waived the first of these points and that the district court's calculations were correct in any event, whether used for the sentence or the restitution order.

The Supreme Court has emphasized the difference between waiver and forfeiture. See *United States v. Olano*, 507 U.S. 725, 730-34 (1993). There the Court wrote that "[w]aiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *Id.* at 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). We do not lightly find waiver, but in this case we think that the record can be

read in only one way, and that is as a waiver. At the sentencing hearing, the following colloquy occurred between Adcock's counsel and the court:

> COUNSEL: Your honor, I think Mr. Kistner did an excellent job of putting the pre-sentence investigation together. I think for purposes of the dollar amount for purposes of criminal liability under the sentencing guidelines, the calculation is correct.
>
> We would argue and will argue to the Court that essentially the Government suffered no loss for restitution purposes. That is that it received value for the monies expended.
>
> I understand and I believe he correctly states the 41,000 dollar amount puts it within the range of 30 to 70,000 dollars. But my point is as to the objection that appears on page 23, we don't have—I'm not withdrawing it, I'm just advising the Court of what if [*sic*] is. I don't see it as an objection that needs to be fleshed out.
>
> THE COURT: All right.
>
> COUNSEL: You understand my point, Judge?
>
> THE COURT: You're arguing it as to the restitution figure, not for the calculation of amount of loss for guideline purposes?
>
> COUNSEL: Correct. Because I believe the value received—in fact, quite frankly, they did it lower than anyone else could have done it. The Government received value for it. Now, how they received it and what was done incorrectly, that's what we're arguing. Do you understand that issue?
>
> THE COURT: Yes, I understand.

The district court concluded by saying, "There is now no objection to the amount of loss calculation for loss purposes," and it repeated the same point in its written post-sentencing order.

This is as square a waiver as one could find. As the government notes, it is almost identical to the waiver we found in *United States v. Sensmeier*, 361 F.3d 982, 986-87 (7th Cir. 2004); see also *United States v. Cunningham*, 405 F.3d 497, 502 (7th Cir. 2005) (". . . Cunningham's attorney's affirmative decision to withdraw his objection to the admission of the pictures as exhibits resulted in a waiver of any argument that the government failed to set forth a sufficient foundation for their admission."). Adcock offers two ways around this explicit waiver. First, he attempts to rely on a *pro se* objection to the calculation of loss in the Presentence Investigation Report. He included this among 12 *pro se* objections that he added to the three that his attorney raised. But the court was under no obligation to consider that *pro se* objection, even if it had been explicit enough to alert the judge to the argument (and we agree with the district court that it was not), because Adcock was represented. Adcock also briefly suggests that counsel rendered ineffective assistance on this point, since he can imagine no strategic reason why someone would concede an amount of loss for purposes of sentencing but try to contest it for restitution. This argument, however, is too abbreviated for us to assess counsel's effectiveness at this stage. Adcock may pursue this point, if he wishes, in a petition under 28 U.S.C. § 2255. But as we shall see in a moment, there may well be reasonable strategic reasons why an attorney would pursue a challenge to a restitution amount without also quibbling over the loss calculation under the guidelines.

Turning to the order requiring Adcock to pay HACC $41,174.09 in restitution, we are met again with a waiver argument from the government. Here, it complains only that Adcock did not spend much time in his brief focusing on this issue. Indeed, a speed-reader might skip right over the five lines that address restitution directly. But, fairly read, we think that the general arguments Adcock made about the amount of loss were intended to address that calculation both for sentencing purposes and for restitution purposes. Rather than dismiss this point on the ground of waiver on appeal, we prefer to reach the merits.

At the outset, it is important to note that the definition of loss for purposes of § 2B1.1(b)(1) is different from the definition of loss for restitution purposes. Under the Sentencing Guidelines, the court typically applies the greater of actual or intended loss. See § 2B1.1(b)(1), cmt. n.3(A). The comments to § 2B1.1 further specify that "[i]n a case involving government benefits . . . loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses . . . ." Cmt. n.3(F)(ii). Adcock was certainly not an intended recipient of HACC's funds, regardless of whether he might have taken those funds and done with them something useful for HACC. Thus, it seems to us that Adcock's attorney made a reasonable strategic decision to forego any challenge to the loss calculation for guidelines purposes.

Because Adcock was convicted of a crime of fraud, he was subject to the Mandatory Victim Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A(c)(1)(A)(ii). We described the scope of that statute in *United States v. Havens*, 424 F.3d 535 (7th Cir. 2005):

In the case of an offense resulting in damage to property, the MVRA requires the defendant to return the property to the victim or if that is not possible, to pay the victim an amount equal to the loss of value of the property. See § 3663A(b)(1). We have noted that "[t]his measure of relief is less generous than common law damages, since it does not extend to consequences beyond the diminution of the value of the property stolen or damaged." *United States v. Scott*, 405 F.3d 615, 618 (7th Cir. 2005). This is because criminal restitution refers only "to the restoration of something that the defendant had taken from the plaintiff, including a profit." *Id.* at 619 (citations omitted).

424 F.3d at 537. Adcock argues that he did not take anything from the government. Instead, he points out, HACC awarded A-1 the painting contract because it was the low bidder; A-1 painted the apartments; and HACC paid the agreed price. The contract price established, by definition, the fair market value of the services that HACC was seeking. Ergo, Adcock concludes, HACC suffered no harm.

The district court saw things differently. The record contained more evidence than that of the prices established in the contract between HACC and A-1 of the value of the services. It contained both the evidence of the nominal A-1 contract price and the evidence of what the actual painter, Miller, was willing to accept for the services she was rendering. Here is how the district court put it:

The Housing Authority paid 70 some thousand dollars or thereabouts for this painting contract. The woman who did all the painting got 29,000 and some dollars. You really were the force behind A-1 or A+

maintenance, got the rest. You didn't do any of the work. A little bit of money went for paint, a little bit of money went for insurance, but a whole lot of money went to you, and you didn't do the work.

\*   \*   \*

Well, if Naiden Miller was willing to do the work for 29,000 dollars, if only she had submitted a bid in her own name, they wouldn't have paid 70,000 for what somebody would do for 29,000. They got 29,000 plus of painting, they didn't get full value. To say that they got full value says it is okay for you to pocket 38,000 dollars for virtually doing nothing except pocketing the money through your bank accounts for A-1.

In the end, the district court concluded that Adcock had to pay $41,174.09 in restitution to HACC. It reached that amount by adding up the $38,155.34 that it determined Adcock had received in the scheme and an additional $3,018.75 that HACC had to pay for an audit that uncovered his wrongdoing. The $38,155.34 figure, it is worth noting, is lower than the total Adcock reaped from the scheme. From April 1999 through March 2001, HACC paid invoices from A-1 totaling $73,060. Subtracting the $27,500 that Adcock paid Miller, that leaves $45,000 in profit to Adcock. The extra $7,400 or so was a reasonable amount to hold back for Adcock's administrative contributions. HACC paid directly for most of the paint, and Miller purchased most of her own supplies, and so there was little need to create an allowance for those purposes. It was Adcock's responsibility to present some evidence to that effect, in response to the government's showing, and we can find nothing that undermines the government's numbers.

In a case involving loss of property, like this one, the MVRA requires the defendant to pay an amount equal to the value of that which was taken. See 18 U.S.C. § 3663A(b)(1)(B). It also requires the court to reimburse the victim for "other expenses incurred during participation in the investigation or prosecution of the offense . . . ." *Id.* § 3663A(b)(4).

We conclude that the district court's factual conclusion that Adcock's services were minimal in value was not clearly erroneous. The court reasonably found that the bulk of the payments HACC made that did not find their way to Miller were properly the subject of restitution, as was the cost of the audit.

For these reasons, we AFFIRM the judgment of the district court, with respect to both Adcock's convictions and his sentence.