In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 24-1599

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRIAN GUSTAFSON,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-00474-3 — **Manish S. Shah**, *Judge.*

_____

ARGUED JANUARY 14, 2025 — DECIDED MARCH 5, 2025

_____

Before RIPPLE, BRENNAN, and KOLAR, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Brian Gustafson was convicted in the
United States District Court for the Northern District of Illinois[1] on wire fraud charges arising out of thefts from a storage
unit in the storage facility where he was employed. The district court sentenced him to twenty-four months'

_____

[1] The district court's jurisdiction was predicated upon 18 U.S.C. § 3231.

imprisonment, followed by two years of supervised release. The court also issued a restitution order. Mr. Gustafson now challenges both his conviction and his sentence. For the reasons set forth in this opinion, we now affirm the judgment of the district court.[2]

## I

## BACKGROUND

### A.

Mr. Gustafson worked as a manager of a Public Storage facility in Deerfield, Illinois. His managerial responsibilities included renting out units, keeping the facility clean, and conducting lock checks. During his shifts, he was the only employee present. John Garcia began renting a storage unit at the facility in late 2019 to store his belongings while he was homeless. Garcia met Marilyn Rothschild and, to make money while jobless, he began selling items from her father's house for her in exchange for a portion of the proceeds. Garcia also met Mr. Gustafson during his frequent visits to the storage facility. He gave Mr. Gustafson his phone number "[i]n case [Mr. Gustafson] ever came across items that [Garcia] could possibly sell for him."[3] Garcia then attempted to "build a trust relationship" by giving Mr. Gustafson money, alcohol, and food.[4] Initially, Mr. Gustafson asked Garcia to sell items such

---

[2] Our jurisdiction is secure under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[3] Trial Tr. at 429–30.

[4] *Id.* at 437–38, 543.

as "stereo receivers, record players, albums," and other property that was abandoned or given to him by former tenants.[5]

"[M]aybe a month before the pandemic," Mr. Gustafson passed by Shawn Fagan's storage unit while it was open.[6] He remarked to Fagan, "Boy, you've got a lot of really nice stuff in here."[7] In a later interaction, Mr. Gustafson asked Fagan whether some of the items had come from the auction house Christie's. Mr. Gustafson told Garcia about Fagan's unit. He then gave Garcia a key to access it and helped remove over 150 items, often acting as a lookout and occasionally helping carry items to Garcia's car. Examples of the items stolen included an oil painting, a crossbow, a wooden carving of the Virgin Mary, a set of silver candlestick holders, and a large sword, all of which were centuries-old and valued conservatively for a total of $185,000.

Garcia and Rothschild began to solicit buyers for the items stolen from Fagan. During this process, Garcia told Mr. Gustafson of prospective buyers, including one in New York. Garcia then arranged transactions with William Crescent, owner of Crescent Jewelers in Lansing, Illinois, and Jonathan Kraft, owner of an auction house in Indiana. To provide assurances of authenticity to their buyers without revealing their true origin, Garcia and Rothschild represented that the items belonged to Rothschild's ailing father. When texting Crescent to coordinate a meeting, Garcia, who at the time did not have a bank account, repeatedly requested cash payments. But on

---

[5] *Id.* at 430, 432.

[6] *Id.* at 175–76.

[7] *Id.* at 176.

April 29, 2020, when Rothschild met the buyers, Crescent paid her $25,000 by check for antiques and a painting and $6,500 in cash for swords. Kraft paid her $43,850 in cash for artwork. Rothschild met the pair again on May 2, 2020, at which point she requested cash for the items on offer. However, she accepted Kraft's $56,000 in cash and $6,000 by check "to make up the difference" because Kraft did not have enough cash on hand to pay the full price.[8] Rothschild deposited the checks into her bank account, initiating interstate wire transfers.

The FBI began investigating the scheme, and an agent interviewed Mr. Gustafson on multiple occasions. Mr. Gustafson admitted to the agent that Garcia paid him cash four times in the following amounts: $270; $1,325; $540; and $5,000. He attributed the latter two payments to his acting as a lookout for Garcia while Garcia stole items from Fagan's unit.

**B.**

A grand jury indicted Mr. Gustafson, Garcia, and Rothschild on two counts of wire fraud in violation of 18 U.S.C. § 1343.[9] Garcia filed, and the district court granted, a motion for severance. The jury convicted Mr. Gustafson of both counts of wire fraud. The district court sentenced him to twenty-four months in prison and two years of supervised release. It further ordered him to pay $330,237 in restitution, jointly and severally with Garcia and Rothschild.

Mr. Gustafson then filed motions for a judgment of acquittal and a new trial, contending that he did not cause the

---

[8] *Id.* at 316.

[9] Garcia also was indicted for two additional counts of wire fraud based on texts that he had sent to the prospective buyer in New York.

interstate wire transmissions. The district court denied his motions. It first concluded that the evidence was insufficient to prove that Mr. Gustafson knew wire transmissions would occur in the ordinary course of business. However, the court also ruled that the use of wires was reasonably foreseeable to Mr. Gustafson. Even though Garcia requested cash and paid Mr. Gustafson in cash, the items were very valuable "and a commonsense inference from the act of selling such items is that payment would come in some electronic form."[10] Mr. Gustafson timely appealed the district court's decision.

## II

## DISCUSSION

Mr. Gustafson contends on multiple grounds that his conviction and sentence are infirm. He first challenges the sufficiency of the evidence underlying his wire fraud conviction. He also submits that the prosecutor committed misconduct during her closing rebuttal argument. Finally, he maintains that the restitution order violates his Sixth Amendment rights. We will address each issue in turn.

## A.

Mr. Gustafson first submits that the record contains insufficient evidence to support his wire fraud conviction. We review de novo the district court's denial of a motion for judgment of acquittal. *United States v. Foy*, 50 F.4th 616, 622 (7th Cir. 2022). We review the evidence presented at trial "in the light most favorable to the government and affirm the conviction if any rational trier of fact could find the defendant guilty beyond a reasonable doubt." *United States v. Peterson*, 823 F.3d

---

[10] R.312 at 2.

1113, 1120 (7th Cir. 2016).[11] We review for abuse of discretion the denial of a motion for a new trial. *Foy*, 50 F.4th at 622.

We begin with the text of the statute of conviction. Section 1343 of Title 18 provides, in relevant part, that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire … any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

To establish a violation of that statutory provision, the Government must prove that Mr. Gustafson (1) participated in a scheme to defraud; (2) intended to defraud; and (3) caused an interstate wire to be used in furtherance of the scheme. *See United States v. White*, 737 F.3d 1121, 1129 (7th Cir. 2013).[12] Mr. Gustafson concedes that the Government proved the first two elements of wire fraud beyond a reasonable doubt. He disputes, however, the third element.

To establish causation, the Government can show "that the defendant himself personally performed the wire transfer." *United States v. Adcock*, 534 F.3d 635, 640 (7th Cir. 2008).

---

[11] *See also United States v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016) ("Given our deference to jury determinations on evidentiary matters, we rarely reverse a conviction for mail or wire fraud due to insufficient evidence.").

[12] *See also United States v. Adcock*, 534 F.3d 635, 639 (7th Cir. 2008).

More commonly, though, the Government fulfills its burden of establishing the third element by showing that the defendant acted with knowledge that the use of a wire would "follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *United States v. Turner*, 551 F.3d 657, 666 (7th Cir. 2008) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9 (1954)).[13]

### 1.

The ordinary course of business approach focuses on the defendant's subjective knowledge. To demonstrate causation, the Government must prove that the defendant knew an entity's ordinary course of business was to use wires. *See Adcock*, 534 F.3d at 640. As the Third Circuit stated in *United States v. Bentz*, 21 F.3d 37 (3d Cir. 1994), "Use of the wire in the ordinary course of business alone is not enough; the defendant must have knowledge of that course of business." *Id.* at 41. In *Bentz*, the defendant sold scrap metals that he misrepresented as stainless steel to a company in Pennsylvania. *Id.* at 38. To generate a check in payment, the company sent wire transmissions to its computers in New York. *Id.* Because the defendant did not know of the computerized check generation system, held the Third Circuit, he did not know that the company used wire transmissions in the ordinary course of business. *See id.* at 41.

---

[13] *Pereira v. United States*, 347 U.S. 1 (1954), involves mail fraud, but "we may draw upon reasoning from mail fraud cases, as 'cases construing the mail fraud statute [18 U.S.C. § 1341] are applicable to the wire fraud statute [18 U.S.C. § 1343].'" *United States v. White*, 737 F.3d 1121, 1129 n.4 (7th Cir. 2013) (alterations in original) (quoting *United States v. Gimbel*, 830 F.2d 621, 627 (7th Cir. 1987)).

In *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993), we reached a similar conclusion. There the jury convicted a sports agent of mail fraud for covertly signing contracts with college athletes, rendering them ineligible for college athletics. *Id.* at 1221. The use of the mails occurred when universities required the athletes to fill out forms verifying their eligibility, then mailed copies of those forms to athletic conferences. *Id.* In reversing the agent's conviction, we concluded that "[n]o evidence demonstrate[d] that Walters *actually* knew that the colleges would mail the athletes' forms." *Id.* at 1223. The record was "barely sufficient to establish that Walters knew of the forms' existence," let alone their mailing. *Id.*

### 2.

By contrast, the reasonable foreseeability approach is an objective test. *Bentz*, 21 F.3d at 40; *see also United States v. Muni*, 668 F.2d 87, 90 (2d Cir. 1981) ("By invoking an objective test of reasonable foreseeability, the law avoids both a premium on ignorance and a vast range of liability for remote and unlikely physical consequences."); *United States v. Taylor*, 942 F.3d 205, 215 (4th Cir. 2019) (describing the focus "on a reasonable officer in the position of the defendant[]"). Under this approach, the Government can establish causation by showing that a reasonable person in the defendant's position would have foreseen the use of wires in furtherance of the scheme. *See Adcock*, 534 F.3d at 640–41. What falls within the bounds of reasonable foreseeability "must inevitably keep pace with advances in technology and general awareness of such advances." *Muni*, 668 F.2d at 90.

When a fraudulent scheme involves selling a high volume of valuable items, the use of wires is reasonably foreseeable. In *United States v. Hasson*, 333 F.3d 1264 (11th Cir. 2003), the

owner of an "upscale jewelry and gift store" was convicted of wire fraud for misrepresenting the value of jewelry he sold. *Id.* at 1268. On appeal, he alleged that the use of wires was not foreseeable. *Id.* at 1270. The Eleventh Circuit disagreed, holding that the use of wires was reasonably foreseeable to the defendant because "[h]is customers frequently spent thousands or hundreds of thousands of dollars on" what they believed were "fine gems and jewelry." *Id.* at 1268, 1272. In the court's view, "[i]t was foreseeable that these customers would at some point make use of the interstate wires to transfer large sums of money to complete some of their many expensive purchases." *Id.* at 1272.

The use of wires also is reasonably foreseeable when necessary to transfer money between geographically distant points. In *United States v. Adcock*, 534 F.3d 635 (7th Cir. 2008), we held that it was reasonably foreseeable that wires would be used to transfer money from a government agency located in Washington, D.C. to a corporation in Illinois. *Id.* at 640–41. As we put it, "The days of Pony Express riders galloping across the countryside with large satchels of cash are long gone." *Id.* at 640; *accord Muni*, 668 F.2d at 90. The principle underlying *Adcock* accords with *United States v. Smothers*, 435 F.2d 209 (7th Cir. 1970). In *Smothers*, we held, relying on the Supreme Court's decision in *Pereira v. United States*, 347 U.S. 1 (1954), that a defendant could reasonably foresee that two banks in different cities and states would use the mail to transmit documents. *Id.* at 212.

### 3.

With these principles in mind, we turn to the record before us. We agree with our colleague in the district court that there was insufficient evidence that Mr. Gustafson actually knew

wires would be used in the ordinary course of business. Even though one of Garcia's customers testified that he paid by check roughly fifty percent of the time,[14] the record does not establish that Mr. Gustafson actually knew that payment by check was part of the course of business. *See Bentz*, 21 F.3d at 41. Like the *Bentz* defendant, who did not know of or engage with the check generation system, Mr. Gustafson did not directly engage with Garcia's buyers. *See id.* And, like the defendant in *Walters* who did not know that colleges would mail the athletes' eligibility forms, Mr. Gustafson did not know that buyers would pay by check. *See Walters*, 997 F.2d at 1223. Moreover, that each of Garcia's four payments to Mr. Gustafson were in cash provides some support that Mr. Gustafson lacked actual knowledge that the use of wires was occurring. Because the record does not contain evidence of Mr. Gustafson's personal knowledge of the transactions, the Government failed to prove that he knew of an ordinary course of business involving the use of wires.

However, as the district court determined, the record does contain sufficient evidence to permit a rational trier of fact to conclude that the use of wires was reasonably foreseeable to Mr. Gustafson. Certainly, the value and volume of the items at issue provide support for a finding of reasonable foreseeability. As in *Hasson*, where buyers often spent large sums of money on the goods, Crescent and Kraft each paid tens of thousands of dollars to acquire a few of the rare antiques on offer. *See Hasson*, 333 F.3d at 1268. To exemplify the nature of goods involved in the scheme, the prosecutor presented the jury with five of Fagan's antiques: an oil painting, a crossbow,

---

[14] Kraft testified that he paid in check or cash, "[u]sually about 50/50," depending on the seller's preference. Trial Tr. at 326.

candlestick holders, a wooden carving, and a sword. Fagan estimated that the painting alone would fetch anywhere from $150,000 to $300,000. And Mr. Gustafson knew the items were valuable, as evidenced by his comment to Fagan that he had "a lot of really nice stuff"[15] and his inquiry into whether some of the items had come from a reputable auction house. Given the high volume of valuable items to be sold, Mr. Gustafson reasonably could foresee that at least some of the buyers would use wires to transfer the large sums of money required to purchase the antiques. *See id.* at 1272.

That Mr. Gustafson knew Garcia had a prospective buyer in New York further supports a finding of reasonable foreseeability. As in *Adcock*, where "[a] reasonable person certainly would have foreseen the need to" use wires to transfer money between Washington, D.C. and Illinois, 534 F.3d at 640, a reasonable person would have foreseen the need to use wires to transfer money between New York and Illinois. Even though there is no evidence that the individual in New York purchased any of the stolen goods, Mr. Gustafson knew the scheme could involve a buyer in a geographically distant state who might well use wires to transfer money. Thus, the use of wires was reasonably foreseeable to him.

Mr. Gustafson maintains that his case resembles *Walters*, where we rejected the Government's contention that "all frauds involving big organizations necessarily are mail frauds, because big organizations habitually mail things." 997 F.2d at 1223. The sheer size and nature of the NCAA did not render the use of the mail in a fraudulent scheme reasonably foreseeable. *See id.* To draw a parallel to *Walters*,

---

[15] *Id.* at 176.

Mr. Gustafson characterizes the Government's argument as follows: "[A]nytime there is a sale of stolen goods on the secondhand market, it is reasonably foreseeable that a wire will be used."[16] However, the Government's argument, which we find persuasive, is much more limited: Where, as here, parties sell large quantities of highly valuable goods on the secondhand market to reputable buyers, the use of wires is reasonably foreseeable.

For these reasons, there was sufficient evidence from which the jury could rationally conclude that Mr. Gustafson caused interstate wire transfers.

**B.**

Mr. Gustafson next maintains that the prosecutor's comments during her closing rebuttal argument constituted prosecutorial misconduct. When discussing the timing of Garcia's four payments to Mr. Gustafson, the prosecutor stated that the fourth payment:

> [M]ay have happened on April 29 or April 30. We don't know. But the defense counsel saying it happened before that transaction is argument. It's not evidence.
>
> The evidence that you have in this case is Garcia's testimony. He's the one who took the stand, took an oath to tell the truth, was subject to cross-examination. He's the testimony whose credibility you are able to judge. And what he said is, "I sold to Kraft and Crescent twice, and I paid the defendant out of those deals." That's

---

[16] Appellant's Br. 22.

> the evidence that the defendant was paid out of
> those deals.[17]

The prosecutor went on to say, "So Garcia says [Mr. Gustafson] was paid out of that. There's nothing to contradict that he wasn't. No one came in here and said anything different than that."[18] Mr. Gustafson's counsel did not object to these statements at trial.

When assessing claims of prosecutorial misconduct, we first determine whether the prosecutor's comments were improper in isolation. We then examine "whether the remarks in the context of the whole record denied the defendants the right to a fair trial." *United States v. Kelerchian*, 937 F.3d 895, 916 (7th Cir. 2019) (quoting *United States v. Durham*, 766 F.3d 672, 684 (7th Cir. 2014)); *see also United States v. Mietus*, 237 F.3d 866, 870 (7th Cir. 2001). Because Mr. Gustafson did not raise this argument in the district court, our review is for plain error; Mr. Gustafson therefore must show "that the outcome of that trial probably would have been different absent the prosecution's remarks." *United States v. Hills*, 618 F.3d 619, 640 (7th Cir. 2010).[19] "In essence, the question is whether the argument was so egregious that the trial judge was required to intervene without a defense objection." *Kelerchian*, 937 F.3d at 917.

---

[17] Trial Tr. at 885.

[18] *Id.* at 886.

[19] *See also United States v. Durham*, 766 F.3d 672, 684 (7th Cir. 2014) (describing plain error review as a "steep hill to climb"); *United States v. Gan*, 54 F.4th 467, 480 (7th Cir. 2022) ("Reversals are exceedingly rare for closing arguments that did not draw even an objection at trial.").

**1.**

We first examine whether the prosecutor's remarks were improper. The Fifth Amendment prohibits prosecutors from commenting on a defendant's decision not to testify. *See Griffin v. California*, 380 U.S. 609, 615 (1965). Accordingly, a prosecutor may not make direct or indirect comments "that lead the jury to draw a negative inference from a defendant's decision." *United States v. Tucker*, 714 F.3d 1006, 1014 (7th Cir. 2013). "[A]n indirect comment will be deemed improper 'only if (1) the prosecutor manifestly intended to refer to the defendant's silence or (2) a jury would naturally and necessarily take the remark for a comment on the defendant's silence.'" *Id.* (quoting *Mietus*, 237 F.3d at 871). For example, a prosecutor's insinuation "that the Government's evidence is uncontradicted, undenied, unrebutted, [or] undisputed" is improper when the defendant is the only witness who could provide contrary testimony. *Id.* at 1014–15 (internal quotation marks omitted) (quoting *United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir. 1996)).

The most reasonable interpretation of the prosecutor's remark is that it was a rebuttal to defense counsel's reference to facts not in evidence. Although the prosecutor did say that there was no evidence to "contradict" Garcia's testimony about when he paid Mr. Gustafson, this comment was clearly aimed at defense counsel's suggestion that the factual record permitted a contrary conclusion. Moreover, the prosecutor's remark that defense counsel's statements were "not evidence" was proper. *See United States v. Carswell*, 996 F.3d 785, 797 (7th Cir. 2021).

**2.**

In any event, there can be no doubt that the remarks did not deprive Mr. Gustafson of his right to a fair trial. At this step, we consider (1) "the nature and seriousness of the misconduct;" (2) the extent to which the defense invited the comments; (3) the extent to which jury instructions ameliorated the prejudice; (4) "the defense's opportunity to counter any prejudice;" and (5) "the weight of the evidence supporting the conviction." *Kelerchian*, 937 F.3d at 916–17 (quoting *United States v. Common*, 818 F.3d 323, 333 (7th Cir. 2016)). We "place considerable emphasis on" the third and fifth factors. *Common*, 818 F.3d at 333.

Here, the district court gave an instruction that told the jury that Mr. Gustafson had a right not to testify. Specifically, the district court instructed the jury that Mr. Gustafson had "an absolute right not to testify," and that it "may not consider in any way the fact that the defendant did not testify."[20] The district court further explained that Mr. Gustafson was "not required to produce any evidence at all."[21] *See Tucker*, 714 F.3d at 1015 (holding that there was no prejudice when the jury was instructed that the defendant had a right to remain silent and did not have to put on evidence). Moreover, as discussed at length *supra*, there was sufficient evidence to prove Mr. Gustafson committed wire fraud. And, defense counsel's comments, made without a factual basis, that Garcia's payments to Mr. Gustafson predated any of the transactions involving checks, certainly were the genesis of this episode. *See Durham*, 766 F.3d at 685 (finding no prejudice in part

---

[20] Trial Tr. at 833.

[21] *Id.* at 831.

because defense counsel "invited" the prosecutor's comments by misspeaking). Finally, although the prosecutor made the comments during her rebuttal, defense counsel failed to object to the remarks.

There is no support for Mr. Gustafson's contention that the prosecutor's comments deprived him of a fair trial.

## C.

Finally, Mr. Gustafson submits that the restitution order violates his Sixth Amendment rights because the facts supporting it were not found by a jury. He is correct that in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and related cases, the Supreme Court held that, pursuant to the Sixth Amendment, "facts underlying certain criminal punishments must be proven beyond a reasonable doubt to a jury." *United States v. Bonner*, 522 F.3d 804, 806 (7th Cir. 2008); *see also Blakely v. Washington*, 542 U.S. 296 (2004); *United States v. Booker*, 543 U.S. 220 (2005). But under our case law, restitution is a civil remedy to which the Sixth Amendment does not apply. *See, e.g.*, *Bonner*, 522 F.3d at 807; *United States v. Seals*, 419 F.3d 600, 610 (7th Cir. 2005) ("This court has ruled that the Sixth Amendment does not apply to restitution because it is a civil remedy, and one for which there is no statutory maximum."). Therefore, the court's restitution order was constitutional.[22]

---

[22] Were we to join the majority of our sister circuits in their conclusion that restitution is instead a criminal penalty, see *United States v. Leahy*, 438 F.3d 328, 334–35 & 335 n.9 (3d Cir. 2006) (en banc) (reaffirming its "view, consistent with the view of the majority of the Circuits to have addressed this issue, that restitution ordered as part of a criminal sentence is criminal rather than civil in nature" and collecting cases from the Fifth, Eighth, Ninth, Eleventh, and D.C. Circuits), our ultimate conclusion would not change. ( … continued)

## Conclusion

The judgment of the district court is affirmed.

AFFIRMED

---

Even in those circuits, judicial fact-finding to support a restitution order does not run afoul of the Sixth Amendment. *See, e.g.*, *id.* at 338 ("[W]e do not believe that ordering a convicted defendant to return ill-gotten gains should be construed as increasing the sentence authorized by a conviction pursuant to *Booker*."); *United States v. Green*, 722 F.3d 1146, 1149 (9th Cir. 2013) ("*Apprendi* and its progeny … don't apply to restitution."); *United States v. Garza*, 429 F.3d 165, 170 (5th Cir. 2005); *United States v. Sosebee*, 419 F.3d 451, 461 (6th Cir. 2005).