**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Harry A. NELSON, Jr., Defendant–
Appellant.**

No. 92–2906.

United States Court of Appeals,
Seventh Circuit.

Argued May 3, 1993.

Decided Sept. 16, 1993.

Matthew L. Jacobs (argued), Asst. U.S. Atty., Milwaukee, WI, for plaintiff-appellee.

Edward John Hunt (argued), Milwaukee, WI, for defendant-appellant.

Before POSNER and COFFEY, Circuit Judges, and WILLIAMS, Senior District Judge.*

* The Honorable Spencer M. Williams, Senior District Judge of the United States District Court for the Northern District of California, is sitting by designation.

COFFEY, Circuit Judge.

Harry A. Nelson was convicted of five counts of bank fraud, 18 U.S.C. § 1344, and seven counts of submitting false statements to a federally insured financial institution, 18 U.S.C. § 1014. Pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), the district court sentenced Nelson to concurrent terms of 51 months' imprisonment on each count. Nelson appeals his conviction and sentence. We affirm.

## I.

The relevant facts are not in dispute. In 1983, Nelson established a revolving line of credit with Norwest Bank (then known as the Citizen's Bank of Sheboygan, Wisconsin) in the maximum amount of $1.7 million. Nelson used the money to purchase J.M. Bucheimer, Inc., a Frederick, Maryland leather goods company and he served as Bucheimer's president. Under the terms of its lending relationship with Norwest, Bucheimer was required to provide the bank with annual audited financial statements, monthly income statements and balance sheets, and debtor's certificates setting forth the amount of assets pledged to the bank as collateral for the loan. These assets included the accounts receivable of the business, the inventory of the business, as well as the value of the business's equipment. Under the agreement, the Bank would lend Nelson an amount up to the value of 80% of his inventory and an amount equal to the value of his equipment, up to $400,000. The sum of these amounts was referred to as Bucheimer's "borrowing base."

Several Bucheimer officials, including the vice president for sales, the vice president for operations, the vice president for finance, and a billing clerk, all testified that Nelson falsified financial documents submitted to Norwest in order to overstate Bucheimer's value and thereby increase the borrowing base available from the Bank. In furtherance of this scheme, Nelson signed numerous debtor's certificates which falsely overstated Bucheimer's accounts receivables, provided Bank auditors with similarly fraudulent information, and submitted monthly and annual financial statements with inflated accounts receivable amounts. In addition, Nelson engineered the creation of a fictitious company and also ordered Bucheimer employees to create false documentation purporting to record Bucheimer's sales to that company, further inflating Bucheimer's value. The accounts receivable for the fictitious company reflected an amount of $198,086.03, and was continuously carried on Bucheimer's books from December, 1988 until June, 1990.

By February, 1990, Nelson had defaulted on his payments to Norwest Bank. Bucheimer declared bankruptcy, and was liquidated. Norwest suffered a loss of approximately $2.1 million from the unpaid balance of the loan he fraudulently secured.

## II.

Nelson concedes in his brief "that a scheme to defraud the bank did exist" and that "[f]alse statements were submitted" to Norwest Bank. However, Nelson claims that "in light of his mental condition, [he] did not knowingly and intentionally participate in the criminal acts" committed by Bucheimer employees. This contention undergirds Nelson's central argument on appeal, which is that the district court committed reversible error by excluding psychiatric evidence which would have demonstrated that he did not knowingly defraud Norwest Bank. Nelson maintains that the "proffered psychiatric evidence excluded by the trial court was relevant to explaining how Mr. Nelson could have been the president of [Bucheimer] and not been aware that fraud was taking place," and to persuading the jury that he did not intend to defraud the Bank or submit false statements to it. According to Nelson, the evidence would have established that he suffered from a neuropsychological impairment, defects in memory, attention and concentration, and from the effects of excessive use of valium, all of which would have supported his "mental condition" defense.

Nelson sought to introduce evidence of his alleged mental condition in two ways. First, Nelson offered testimony concerning a psychological report prepared about him. The report was accompanied by a pre-trial motion filed by Nelson's counsel requesting that the district court make a determination as to the

defendant's mental competency to stand trial, pursuant to 18 U.S.C. § 4241. In that motion, Nelson's counsel stated that he had "come to the conclusion that Mr. Nelson may be suffering from a mental infirmity which prevents him from rationally understanding the consequences of the charges against him and rationally assisting me in the preparation of his defense." The district court held a hearing and the defendant testified and was questioned by the court. At the conclusion of the hearing, the court "found that there exists probable cause to believe that the defendant ... may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." The court then ordered the defendant committed to the custody of the Attorney General for placement in the Federal Medical Center in Rochester, Minnesota "for the purpose of a psychiatric and psychological examination ... to evaluate and determine his mental competency to stand trial." Dr. L. Thomas Kucharski of the Federal Medical Center conducted the examination of Nelson. Kucharski concluded that Nelson was competent to stand trial. In addition to testimony concerning Kucharski's report, Nelson's counsel also sought to question various Bucheimer employees about an alleged change in Nelson's mental condition and behavior during the time the scheme to defraud Norwest Bank was conducted.

■ Nelson bears a heavy burden in raising a claim that the district court improperly excluded testimony about his mental condition "as the trial judge has broad discretion on evidentiary rulings and we will only overturn such rulings for a clear abuse of that discretion." *United States v. Reno,* 992 F.2d 739, 742 (7th Cir.1993) (quoting *United States v. Lake,* 910 F.2d 414, 418 (7th Cir.1990)). Moreover, even if the district court did err in an evidentiary ruling, we will not reverse the defendant's conviction if the error was harmless. *United States v. Saunders,* 973 F.2d 1354, 1359 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993). Rather, "[w]e will overturn a conviction on evidentiary grounds only if the erroneous ruling had a 'substantial influence over the jury.'" *Id.* (quoting *United States v. Fairman,* 707 F.2d 936, 941 n. 5 (7th Cir.1983)).

In mounting his "mental condition" argument, Nelson relies heavily on *Haas v. Abrahamson,* 910 F.2d 384 (7th Cir.1990) where we compared Fed.R.Evid. 704(b) with Wisconsin's exclusionary rule concerning psychiatric opinion testimony. Rule 704(b) provides that

> "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or *did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.* Such ultimate issues are matters for the trier of fact alone."

(emphasis added). We stated that 704(b) "has the same practical effect as Wisconsin's exclusionary rule concerning psychiatric opinion testimony: both rules exclude psychiatric/psychological opinion testimony on the question of *whether a defendant had the capacity to form the requisite intent constituting an element of the charged offense while allowing relevant expert testimony detailing the defendant's mental health history which might have a tendency to negate the prosecution's proof on the issue of intent."* *Haas,* 910 F.2d at 397 (emphasis added). *See also United States v. Hillsberg,* 812 F.2d 328, 332 (7th Cir.) (evidence as to defendant's capacity to form requisite intent barred), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987). "Evidence offered as 'psychiatric evidence to negate specific intent' is admissible ... when such evidence focuses on the defendant's specific state of mind at the time of the charged offense." *United States v. Cameron,* 907 F.2d 1051, 1067 (11th Cir.1990).

■ The purpose of Nelson's psychiatric examination was to determine whether he was competent to stand trial in January and February, 1992. The scheme to defraud the Bank occurred from November, 1988 until July, 1990. Thus, the district court correctly determined that the testimony concerning the psychiatric report was not relevant to a

determination of Nelson's state of mind at the time of the commission of the offense (1988–90). The district court properly barred its admission on relevancy grounds.

Nelson also argues that the district court erred in refusing to allow his counsel to question witnesses about Nelson's mental condition at the time of the fraud. Nelson presses this argument by pointing to the testimony of Lester Smith, who worked for Nelson at Bucheimer from October, 1987 to July, 1990, first as a bookkeeper/office manager and then as vice president of finance. Defense counsel asked Smith to describe Nelson's mental condition during the time of the fraud. In response, Smith testified that there was a change in Nelson's "attitude and general personality starting back in February, March of '89 and that throughout the rest of the time his personality did change." At that point, the assistant United States attorney objected, arguing that the witness was "not in a position to discuss personality changes and I am not sure how it's relevant, either." The objection was sustained, and defense counsel ceased this line of questioning. The court later explained that it was barring this type of testimony because the psychiatric report was done on Nelson two years after the offense, the defendant had not entered a plea of insanity but had only challenged his competency to stand trial, and the testimony was character evidence not permitted by Fed.R.Evid. 404(a). Nelson argues that his counsel should have been permitted to pursue this line of questioning in support of his mental condition argument.

However, as the defendant concedes in his brief, earlier in the trial the district court did allow defense counsel to pursue this issue with two witnesses. For example, Robert R. Brown, a business banker at Norwest Bank who dealt with Bucheimer and Nelson from early 1989 to early 1990, testified, in response to questioning by defense counsel, that Nelson had a habit of rambling during conversation about topics not directly relevant to the discussion, was difficult to communicate with, and when asked for information about the loan would respond defensively that Brown was questioning his integrity.

Pamela Esche, a loan review analyst at Norwest who helped conduct an audit of Bucheimer in December, 1989, testified that Nelson would often ramble off the point and not answer her questions. Thus, Nelson's argument lacks merit since he was able, through the testimony of Brown and Esche, to get before the jury evidence of his alleged mental problems during the time of the fraud. The jury heard this evidence from Brown and Esche concerning Nelson's alleged impaired thought process and mental condition, but nevertheless concluded that Nelson was a knowing participant in the fraud.

We also reject Nelson's contention that the district court erred in not permitting him to testify that he was suffering from mental problems and that he was abusing valium during the commission of the fraud. As the government points out in its brief, the thrust of Nelson's testimony was that he was not involved in the fraud at all—that he did not order false invoices to be made out, false financial statements to be issued, or the creation of a fictitious customer—not that a fraud occurred without him realizing it. The ultimate trier of fact, the jurors, quite obviously disbelieved Nelson's denials, and believed the testimony of his former employees Lester Smith, James Raftovich, Gene Whipp, and Dallas Watts that Nelson directed the fraud.[1] Moreover, we do not believe that self-serving testimony from a defendant that he was not able to realize that his company was perpetrating a complex fraud on Norwest would have influenced the jury in light of the testimony by numerous Bucheimer employees that Nelson directed the scheme to defraud Norwest Bank.

### III.

The defendant challenges his sentence on two grounds. First, Nelson claims that the district court erred in increasing his base offense level pursuant to U.S.S.G. § 3B1.1(a), which states that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by

---

1. We discuss this testimony in greater detail below.

4 levels." The commentary to § 3B1.1 provides the following guidance in interpreting the provision:

"1. A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted....

2. In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."

At Nelson's sentencing hearing, the district court made the following factual findings concerning the § 3B1.1(a) enhancement:

"THE COURT: ... I, frankly, don't have any doubt in my mind that there were five or more participants in the case. Some of them were what we can describe [as] reluctant participants. Some of them were very rather weak personalities.

Mr. Nelson at that time was riding his ebullient personality in directing everything in a fashion which I think didn't leave much room for argumentation by some of these people, but I am convinced that Raftovich, Smith, Nelson, Whipp ... [and] Watts ... all were aware of what—of what they were doing when it was done at the direction of Nelson. There was this meeting in which assignments were handed out and even Miss ... Rothenhoefer, the secretary, I think she was aware of what was going on.

I think she was. A lot of them were intimidated by Mr. Nelson, but I'm satisfied there were more than five participants who were criminally culpable. Again, I don't like to do it because I think this is kind of an unusual case, but on this particular instance I don't see any wiggle room at all, and I think the Court has to find that Mr. Nelson, who was the president of the company and who conceived · these ideas, was an organizer or a leader in ... an activity that involved five or more participants and was even beyond that.

It was certainly otherwise extensive, and so the Court has to make a finding that the base [offense] level should be increased by fours levels and does so."

"We will reverse the district court's findings of fact regarding a role in the offense enhancement only if it is clearly erroneous." *United States v. Isirov,* 986 F.2d 183, 187 (7th Cir.1993). Nelson concedes in his brief that there were at least three participants in the fraudulent scheme (himself, Lester Smith and James Raftovich),[2] but appears to believe that since no other individuals were charged with criminal offenses in this fraud, there were at most three "participants" for purposes of § 3B1.1(a). However, as we have already noted, the commentary to § 3B1.1 explicitly states that a "participant" is a person who is criminally responsible for the commission· of the offense but need not have been convicted. U.S.S.G. § 3B1.1(a), comment. (n.1). As the district court explained, Gene Whipp, who was the vice president for sales at Bucheimer, testified that he participated in the creation of orders reflecting the phony sales to a fictitious company. Dallas Watts, vice president for operations at Bucheimer, testified that he falsified freight orders in order to document the fictitious sales. Finally, Candy Rothenhoefer, a billing clerk at Bucheimer, testified that she created fictitious sales invoices at the direction of Lester Smith. Smith, in turn, testified that he instructed Rothenhoefer to falsify the invoices only after being ordered to do so by Nelson. Thus, it is clear that more than five participants were involved in this fraud, and that the district court did not err in enhancing Nelson's base offense level four points on that basis.

■ Nelson's final argument is that the district court erred in ordering him to pay $2,032,596 in restitution to Norwest Bank because of his alleged inability to pay. We have only recently reaffirmed the principle that the restitution statute "does not say that indigency is a defense, only that it is a factor the judge is required to take into account" in fashioning a restitution order. *United States v. Boula,* 997 F.2d 263, 268 (7th Cir.1993)

2. The defendant is counted as a participant in determining whether there were five or more

participants under § 3B1.1(a). *United States v. Schweihs,* 971 F.2d 1302, 1318 (7th Cir.1992).

(citation omitted). Here, the presentence report clearly indicated that the defendant had a negative net worth at the time of sentencing. The district court obviously took this fact into account in sentencing Nelson as he stated that the "[t]he Court determines that the Defendant does not have a financial ability to pay a fine, costs of incarceration, community confinement or supervision and, therefore, waives the interests on the fine, costs of incarceration, community confinement and supervision in this case." Like the defendants in *Boula*, 997 F.2d at 268–69, Nelson demonstrated considerable talent in perpetrating his crime. The restitution order gives Nelson an incentive to apply these talents in a lawful manner upon release to make his victim whole. The restitution order was proper.

AFFIRMED.