In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-3384

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AUSTON MCLAIN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:20-cr-40068 — **Sara Darrow**, *Chief Judge*.

ARGUED OCTOBER 31, 2024 — DECIDED JULY 30, 2025

Before SYKES, *Chief Judge*, and RIPPLE and LEE, *Circuit Judges*.

LEE, *Circuit Judge*. Auston McLain exchanged sexually explicit messages and images with an undercover agent, who McLain believed was a fifteen-year-old boy. After the two traded messages about meeting in person, McLain drove from Davenport, Iowa, to Rock Island, Illinois, to meet the boy at what McLain thought was the boy's home. Law enforcement

officers arrested McLain when he arrived. In his possession were condoms and a cell phone containing the messages.

A jury subsequently convicted McLain of attempted enticement of a minor and traveling with intent to engage in illicit sexual activity in violation of 18 U.S.C. § 2422(b) and § 2423(b), respectively. On appeal, McLain takes issue with a number of the district court's decisions, including the exclusion of his experts as well as certain testimony he wished to give at trial. McLain also objects to remarks the prosecutor made during the government's closing argument and an instruction the judge gave to the jury at the conclusion of the trial. Moreover, McLain contends that, even if these errors were individually harmless, their cumulative effect denied him a fair trial. For the reasons discussed below, we affirm.

**I**

In an effort to catch child predators, an undercover FBI agent created a profile on Scruff, an online dating application for gay men. The profile featured the name "CodeyS," the photograph of a young-looking male, and a birth date suggesting the user was eighteen years old. We will refer to the online persona as "Codey."

McLain initiated contact with Codey, telling him he "look[ed] really cute," and asking, "What are you looking for or into?" Codey answered, "Discreet fun. I'm new to this but want to try." When McLain asked whether he was eighteen, Codey said he was "almost 16."

At some point, the two switched from using Scruff to personal text messaging. McLain asked Codey whether he had "a nice cock" and requested "a pic of it." McLain then sent an image of a penis, and Codey responded with an image of his

stomach, after which the two engaged in a sexually explicit conversation. During this exchange, McLain asked Codey to come over to his place. Codey told McLain that he would "have to be gentle and wear a condom." McLain advised Codey to "go [o]n prep," adding that, "Everyone takes it [a]nd then they fuck without care lol." Presumably, McLain was referring to pre-exposure prophylaxis, a drug taken to prevent the spread of HIV. McLain then sent another image of a penis and texted, "I'd love to see your cock."

McLain reached out to Codey again the next day, asked if they were going to meet that coming weekend, and offered to pay for an Uber to retrieve him. Codey replied that he had never used an Uber before and asked McLain to pick him up from his place. In response, McLain lamented: "I thought we had all this works [sic] out and now you're changing it on me man."

Ultimately, McLain agreed to pick Codey up from his home, and the following afternoon, McLain texted Codey, asking "Where do I go?" After Codey provided McLain with an address, McLain texted back: "On my way. Can we kiss when you get in the car?" Less than an hour later, McLain texted, "Pulling up now. I'm in a red SUV." When McLain arrived at the address, he was arrested by awaiting agents. At the time, McLain was carrying his cell phone with the messages he had exchanged with Codey and four condoms.

A grand jury indicted McLain for attempted enticement of a minor in violation of 18 U.S.C. § 2422(b) (Count One) and traveling with intent to engage in illicit sexual activity in

violation of 18 U.S.C. § 2423(b) (Count Two).[1] Section 2422(b) prohibits "using the mail or any facility or means of interstate or foreign commerce … [to] knowingly persuade[], induce[], entice[], or coerce[] any individual who has not attained the age of 18 years, to engage in … any sexual activity for which any person can be charged with a criminal offense, or attempt[] to do so." 18 U.S.C. § 2422(b). Section 2423(b), in turn, forbids "travel[ing] in interstate commerce … with intent to engage in any illicit sexual conduct with another person." *Id.* § 2423(b). Given the issues McLain raises on appeal, we recount the relevant pretrial proceedings and trial testimony as well as the government's closing argument and the jury instruction at issue.

## A. Pretrial Proceedings

Prior to trial, McLain notified the government that he intended to call neuropsychologist Dr. Michael Wilson to testify about McLain's mental condition. Specifically, Dr. Wilson was prepared to opine that:

(1) McLain's wide-spread and severe neurocognitive deficits were primarily caused by a November 2019 cerebral hemorrhage he experienced along with associated medical complications;

(2) McLain's ability to communicate effectively was impaired at the time of the alleged offenses due to his specific neurocognitive deficits;

---

[1] McLain was also indicted for solicitation of an obscene visual depiction of a minor in violation of 18 U.S.C. § 2252A(a)(3)(B) and (b)(1), but the government dismissed that count.

(3) McLain's ability to make sound decisions was neg-
atively affected by his neurocognitive deficits at the
time of the alleged offenses; and

(4) McLain does not demonstrate any psychological
tendencies towards assaultive, aggressive, violent,
or predatory behavior.

The government moved to exclude Dr. Wilson's testi-
mony, arguing that his opinions appeared to be asserting a
diminished-capacity defense (in other words, that McLain
lacked the mental capacity to commit the crimes) but that his
conclusions were irrelevant to such a defense. Alternatively,
the government argued, to the extent Dr. Wilson's opinions
were relevant at all, they were unduly prejudicial and should
be precluded under Federal Rule of Evidence 403.

In response, McLain clarified that he was not asserting a
diminished-capacity defense. Rather, he was offering Dr. Wil-
son to show that he did not have the specific intent to entice a
minor when he went to Codey's house. Instead, asserted
McLain, he went to the house intending to rescue Codey be-
cause McLain believed Codey was a victim of human traffick-
ing. And, according to McLain, Dr. Wilson's testimony about
McLain's diminished decision-making abilities explained
how he could make such a "misguided choice." McLain fur-
ther argued that Dr. Wilson's opinions would help the jury
understand his halting demeanor when he testified at trial
and would demonstrate that he lacked the "pertinent charac-
ter traits" to commit the offenses as permitted by Rule
404(a)(2).

The district court granted the government's motion but
did so without prejudice because it did not have sufficient

information to fully evaluate McLain's arguments before trial. The court nevertheless questioned the probative value of Dr. Wilson's opinion that McLain's decision-making ability was impaired, thinking the opinion too "general" to "somehow negate the specific intent required for this offense." It also observed that introducing expert testimony regarding McLain's psychological tendencies as character evidence had the potential to confuse the jury. Moreover, while acknowledging McLain's concern that his physical and communication impairments could diminish his credibility in the eyes of the jury, the court thought such expert testimony unnecessary because strokes were "commonplace," and McLain himself could testify about the effects of his stroke. Accordingly, the court excluded Dr. Wilson's testimony under Rule 403, finding that any probative value the proffered testimony might have would be substantially outweighed by its prejudicial effect. McLain moved to reconsider the decision, but his motion was denied.

In addition to Dr. Wilson, McLain subpoenaed Dr. Napeek Nair, the neurologist who treated him after his stroke, to testify about his physical symptoms and speech patterns. Like Dr. Wilson, McLain argued, Dr. Nair would help the jury understand his impairments and "properly evaluate [his] credibility." The court precluded this testimony for the same reasons it barred Dr. Wilson's.

## B. The Trial

During the trial, the government presented two federal agents, who discussed McLain's many communications with Codey, the circumstances surrounding McLain's arrest, and the cell phone and condoms seized from his car. In turn, the defense called four witnesses to support its theory that

McLain had traveled to Codey's house intending to rescue him.

First, the defense presented an investigator, who described how a GPS-spoofing application could be used to reveal the approximate locations of users on dating apps like Scruff. This testimony was offered to bolster McLain's claim that he became concerned about Codey after using such an application to navigate Scruff.

After the investigator, McLain presented his former supervisor at Braking Traffik, who explained that the organization's mission was to combat human trafficking and that McLain had worked as an outreach advocate there. The defense also called Scruff's director of customer support, who confirmed that McLain had twice reported the "CodeyS" profile as belonging to an underage user.

The defense's final witness was McLain himself. To begin, he recounted his work as an outreach advocate for Braking Traffik, where he learned how to identify warning signs of human trafficking. McLain then described his experience as a teenager meeting a human-trafficking victim on the website, gay.com. According to McLain, the user, named "Jay," had a profile that suggested he was only fourteen or fifteen years old. After reaching out to Jay, McLain continued, he drove to where Jay was staying in Colona, Illinois, and learned that Jay wanted to go back home to Carbondale. McLain came back the next day with a friend and took Jay to a bus station so he could return home.

As part of his account, McLain attempted to describe the content of Jay's profile and recount Jay's statements to him, but the government objected on hearsay grounds. The court

sustained the objection, explaining to McLain's counsel, "[B]ecause this is 20 years prior to this incident, I'm not comfortable giving you much leeway in terms of why he did what he did if that involves eliciting testimony about what the other individual told him…."

Proceeding with his testimony, McLain told the jury about his stroke and described how it had negatively impacted his physical and mental faculties, including his memory and his ability to speak, particularly in a "stressful situation." The stroke, in his words, "made decisions a lot harder."

McLain ended by explaining his communications with Codey, pointing out the details that piqued his suspicions that Codey was a victim of human trafficking. Although Codey had not asked for money upfront, McLain explained, his understanding was that a trafficker would sometimes seek money after the fact, rather than requesting payment upfront. He gained this knowledge, McLain said, from learning about other trafficking cases. But when McLain attempted to describe those cases, the government objected on hearsay grounds, and the court sustained the objection.

As for the condoms, McLain disavowed any intention to use them during his encounter with Codey and denied having any desire to have sex with a minor. Instead, McLain said, he brought the condoms to give to Codey in case McLain was mistaken and it was "just three guys saying yeah, we're just having fun."

### C. The Government's Closing

After the defense's closing argument, the prosecutor opened his rebuttal with: "Two and a half years. That's how long the defendant and his defense counsel had to make up

the story--." Defense counsel immediately objected, contending that the government was suggesting that the defense had manufactured evidence and that the prosecutor's remarks improperly commented on McLain's invocation of his Fifth Amendment right to remain silent. The court overruled the objection on the first ground but sustained the objection on the second and instructed the jury "to strike the reference to two and a half years, but no other part of the comment."

Picking up where he left off, the prosecutor continued: "Ladies and gentlemen, when it comes down to it, the facts that they're putting forth don't match up to anything. If you look at those chats, you look at the training that Auston says that he has, … it doesn't match up …."

**D. Jury Instruction**

Before the court instructed the jury, the parties stipulated to the elements the government needed to prove to convict McLain of attempting to entice a minor in violation of 18 U.S.C. § 2422(b) (Count One):

1.  The defendant used a facility or means of interstate commerce to knowingly attempt to persuade, induce, or entice an individual to engage in sexual activity; and

2.  The defendant believed that the individual was less than 18 years of age; and

3.  If the sexual activity had occurred, the defendant could have been charged with the criminal offense of Aggravated Criminal Sexual Abuse under Illinois law.

In addition, the government proposed the following jury instruction regarding the intent required under Count One:

The intent required under this violation is the intent to persuade, induce or entice someone whom the defendant believed to be a minor to engage in sexual activity. It is not required for the government to prove that the defendant intended to engage in sexual activity with the minor.

Defense counsel objected to the proposed instruction as being superfluous, but the court accepted the instruction after modifying it to make it clear that it was relevant only to Count One.

In the end, the jury returned a verdict of guilty on both counts. And the court subsequently imposed a custodial sentence of 120 months—the statutorily mandated minimum for the attempted-enticement conviction—as to each offense to be served concurrently.

## II

McLain asserts that the district court committed four errors below. First, he argues that the district court abused its discretion when it barred Drs. Wilson and Nair from testifying. He also challenges the court's decision to bar him from testifying about the contents of Jay's website profile and Jay's statements to him and takes issue with the prosecutor's rebuttal remarks during closing arguments. And, lastly, McLain believes that the district court erred by accepting the government's jury instruction regarding § 2254(b)'s intent requirement. We discuss each contention in turn.

**A. Expert Testimony**

McLain first contends that the district court set too high a standard for admissibility under Rule 401 when it precluded Dr. Wilson from testifying about McLain's mental health condition in an attempt to negate specific intent. We review evidentiary decisions for abuse of discretion. *United States v. Ginsberg*, 817 F.3d 689, 698 (7th Cir. 2020). "We will not reverse if the error is harmless in light of the trial record as a whole." *United States v. Medrano*, 83 F.4th 1073, 1076 (7th Cir. 2023) (internal quotation marks omitted).

"'Evidence offered as psychiatric evidence to negate specific intent is admissible when such evidence focuses on the defendant's specific state of mind at the time of the charged offense.'" *United States v. Nelson*, 5 F.3d 254, 256 (7th Cir. 1993) (quoting *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990)). But district courts ought to scrutinize the proffered testimony to determine whether a defendant specifically demonstrates how such evidence would negate intent rather than "merely present a dangerously confusing theory of defense more akin to justification and excuse." *Cameron*, 907 F.2d at 1067. For example, in *Cameron*, the court rejected the defendant's argument that she should have been allowed to introduce evidence of her schizophrenia because she did not show how this disorder would negate her intent to distribute drugs. *Id.* at 1067–68.

In much the same way, the necessary inferential link between McLain's condition and his purported lack of intent is missing here. In the defense's view, McLain's impaired decision-making ability contributed to his "unwise choice" to rescue someone he believed was a victim of human trafficking rather than contacting the authorities. But, as the district court

recognized, Dr. Wilson's opinion that McLain's stroke had impaired his decision-making skills does not make it more or less probable that McLain lacked the intent to entice Codey to engage in sexual activity when he drove to meet Codey. Thus, the district court was well within its discretion to find that Dr. Wilson's opinion about McLain's poor decision-making was not relevant to the issue of specific intent given the particular charges and circumstances in this case.

But, even if Dr. Wilson's opinion were relevant, the district court, invoking Rule 403, concluded that its probative value was substantially outweighed by its prejudicial effect. Indeed, expert testimony regarding the mental capabilities of a criminal defendant carries a substantial risk of jury confusion and implicates the complex balancing of interests underlying Rule 704(b).[2] *See Haas v. Abrahamson*, 910 F.2d 384, 397 (7th Cir. 1990) (noting that Rule 704(b) "exclude[s] psychiatric/psychological opinion testimony on the question of whether a defendant had the capacity to form the requisite intent … while allowing *relevant* expert testimony detailing the defendant's mental health history which might have a tendency to negate the prosecution's proof on the issue of intent"). And oversimplifications of the kind Dr. Wilson offers here can prompt a jury to disregard the particular facts and circumstances of a case in favor of broad generalities cloaked in the impressive guise of expert testimony. It is for this reason that we have cautioned district courts to "vigorously police" attempts to introduce such evidence at trial. *United States v. Ricketts*, 146

---

[2] Under Rule 704(b), "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."

F.3d 492, 498 (7th Cir. 1998). The district court did not abuse its discretion when doing so here.

But that is not all. Even if the district court had erred by excluding Dr. Wilson's testimony, any error was harmless. First, by taking the stand, McLain was able to explain his own thought process at the time of the offense. Second, the jury was presented with convincing evidence about McLain's guilt, including his numerous sexually explicit and suggestive messages with Codey, as well as the circumstances surrounding his visit to Codey's residence. *See Ginsburg*, 971 F.3d at 698 ("Evidentiary errors are harmful 'only when a significant chance exists that they affected the outcome of the trial.'") (quoting *United States v. Bonin*, 932 F.3d 523, 542 (7th Cir. 2019)).

McLain also submits that the court improperly barred expert testimony from Dr. Wilson, as well as Dr. Nair, regarding the impact of his stroke on his physical demeanor. But given the public's general understanding of strokes, it is not entirely clear how medical testimony about the specifics of McLain's condition would have assisted the jury. After all, McLain himself testified about his condition, and the jury was able to observe him for themselves. *See United States v. Hall*, 165 F.3d 1095, 1104 (7th Cir. 1999) (where expert testimony "addresses an issue of which the jury is already generally … aware," such testimony does not assist the jury). Moreover, there was a substantial risk that the jury would have considered such expert testimony an endorsement of McLain's credibility. *See id.* at 1107 (determining the credibility of witnesses is "generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury"). Accordingly, precluding the physicians from testifying about

McLain's stroke, while allowing McLain to describe his experience to the jury, was a reasonable approach.

Lastly, McLain takes issue with the exclusion of Dr. Wilson's opinion that McLain did not demonstrate any psychological tendencies towards "predatory behavior." As he sees it, this opinion falls within the permissible bounds outlined by Rule 404(a)(2)(A), which allows a defendant in a criminal case to "offer evidence of the defendant's pertinent trait." But we agree with the district court that, in the context of Dr. Wilson's expert report, "predatory" connotes physically violent behavior, and the government made no allegation here that McLain was intending to physically harm Codey in this way.

In any event, the district court once again fortified its decision to exclude this testimony by offering an alternative ground: even if the opinion were relevant, the court found, it would still be precluded under Rule 403, because the jury would be confused into thinking that a person who did not demonstrate "predatory behavior" could not have had the requisite intent to commit the offenses alleged. This was a sound use of the court's discretion.[3]

---

[3] McLain's reliance on *United States v. Graves*, 98 F.3d 258, 260–62 (7th Cir. 1996), is unpersuasive. In *Graves*, we determined that the district court erred in not obtaining an expert to assess the defendant's competency after his plea colloquy suggested that he did not fully understand the proceedings. *Id.* The district court's ability to assess a criminal defendant's competency to plead guilty is entirely different from a jury's capacity to evaluate the testimony of a witness who had suffered a stroke, particularly when the witness is allowed to testify about the stroke and its impact.

**B. Hearsay Ruling**

In addition, McLain argues that the district court incorrectly barred him on hearsay grounds from recounting the contents of Jay's profile as well as Jay's statements to him during their encounter. Although they were out-of-court statements, McLain posits, he was offering them to show the effect the statements had on his state of mind and not for their truth. *See* Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered to prove the truth of the matter asserted). Similarly, McLain says, his description of other sex trafficking cases was intended only to illustrate his understanding that a trafficker sometimes demanded money after the fact rather than before.

McLain is correct insofar as "the rule against hearsay does not bar evidence introduced to show a party's viewpoint or attitudes, or the basis for his or her conclusions." 5 Weinstein's Federal Evidence § 801.11 (2d ed. 2025); *see*, *e.g.*, *United States v. Hanson*, 994 F.2d 403, 407–08 (7th Cir. 1993) (statement to defendant that he was not required to make disclosure was not hearsay because it was offered to show basis of his belief that disclosure not required, regardless of whether statement was true). But, to the extent that the district court erred, the error was harmless.

Here, McLain was allowed to give a detailed account of his encounter with Jay, his understanding of how sex trafficking worked, and his prior work as an outreach advocate at Braking Traffik. The court also permitted him to explain to the jury why he thought Codey was involved in sex trafficking even though Codey had not asked for money upfront. The additional details McLain wished to offer would have added very little to this testimony.

**C. Prosecutorial Misconduct**

Turning to the government's closing argument, McLain maintains that the prosecutor's opening remark in his rebuttal argument—"Two and a half years. That's how long the defendant and his defense counsel had to make up the story"— improperly criticized McLain for invoking his right to remain silent prior to trial and attacked defense counsel personally. When evaluating claims of prosecutorial misconduct, we first must determine whether the prosecutor's remarks were improper. *United States v. Gustafson*, 130 F.4th 608, 617 (7th Cir. 2025).

If we answer the first question in the affirmative, we then assess whether the remarks, when viewed in the context of the entire record, denied the defendant the right to a fair trial. *Id.* In making this determination, we consider (1) the nature and seriousness of the misconduct; (2) the extent to which the defense invited the comments; (3) the extent to which jury instructions ameliorated the prejudice; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction. *Id.* at 618. We "place considerable emphasis on" the third and fifth factors. *United States v. Common*, 818 F.3d 323, 333 (7th Cir. 2016).[4]

---

[4] The parties dispute whether the applicable standard of review is *de novo* or abuse of discretion. We need not resolve the issue because the outcome is the same regardless. Under either standard, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted).

As an initial matter, we share the district court's concern that the prosecutor's remark here came exceedingly close to commenting on McLain's constitutional right to remain silent. *See Gustafson*, 130 F.4th at 617 ("The Fifth Amendment prohibits prosecutors from commenting on a defendant's decision not to testify.") (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)). Moreover, any suggestion by the prosecutor to the jury that defense counsel was engaging in morally repugnant conduct by presenting false evidence is unquestionably inappropriate. *See, e.g., United States v. Bloom*, 846 F.3d 243, 254 (7th Cir. 2017) (the government may point to "the lameness of the defense" and may "criticize[] defense counsel's tactics, [but] not defense counsel personally") (citation omitted); *United States v. Mealy*, 851 F.2d 890, 903 (7th Cir. 1988) (finding an impermissible personal attack where prosecutor suggested even jokingly that defense counsel had committed a crime). We take this occasion to remind the government that the better practice is to stay well within the lines.

That said, the government must have leeway "to comment on the credibility of a witness, including the defendant, as long as the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion." *United States v. Goodapple*, 958 F.2d 1402, 1409–10 (7th Cir. 1992) (citations omitted). Although the prosecutor's statement was inartful, the sentences that immediately followed contrasted McLain's version of events with the trial evidence. Thus, we believe the prosecutor's purpose was to question McLain's credibility rather than denigrate his counsel or impugn his exercise of his Fifth Amendment rights.

What is more, given the totality of the record, the questionable remark did not have the effect of denying McLain a

fair trial. By offering an alternative narrative, McLain opened
the door for the government to challenge his version of the
facts. And, given the strength of the evidence against McLain,
we find it highly unlikely that the prosecutor's remark about
the defense's theory affected the jury's verdict. *See, e.g., United
States v. Washington*, 417 F.3d 780, 787–88 (7th Cir. 2005)
("[L]ike most prosecutorial misconduct claims, [the defend-
ant's] claim founders in the face of the strong evidence of his
guilt."). We therefore find no reversible prosecutorial miscon-
duct.[5]

### D. Jury Instruction

Next, McLain asserts that the district court erred by adopt-
ing the government's jury instruction telling the jury that the
government need not prove that McLain had intended to en-
gage in sexual activity with a minor to convict on Count One.
Whether a jury instruction fairly and accurately summarized
the law is a question we review *de novo*. *See United States v.
Christophel*, 92 F.4th 723, 726 (7th Cir. 2024) (citation omitted).
If the challenged instruction accurately states the law, we will
reverse only if it appears that the instruction both misled the
jury and prejudiced the defendant. *See United States v.
Siepman*, 107 F.4th 762, 765 (7th Cir. 2024) (citations omitted).
We review the district court's decision to give (or refuse to
give) a legally accurate instruction for abuse of discretion. *See
id.* (citation omitted).

---

[5] We are even less persuaded by McLain's argument that the prosecu-
tor's remark implicated his Sixth Amendment right to counsel. Contrary
to McLain's speculation, the remark did not imply that, by taking ap-
pointed counsel, McLain obtained a coconspirator to help him "make up"
a story for the jury.

McLain acknowledges that the intent instruction is a correct statement of law as noted in the comments of the pattern instruction committee:

> *United States v. Berg*, 640 F.3d 239 (7th Cir. 2011), held that the intent required under Section 2422(b) is the intent to persuade, induce or entice someone believed to be a minor to engage in sexual activity. It is not required for the government to prove that the defendant intended to engage in sexual activity with the minor.

William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit at 985–86 (2023 ed.). But McLain asserts that the discussion in *Berg* is dicta. This is incorrect. Our holding in *Berg* hinged on whether proof of an intent to engage in sexual activity with a minor was required to convict on an attempted enticement charge. *See* 640 F.3d at 252–53.

McLain nevertheless contends that this instruction may have confused the jury because it conflicts with the elements instruction that required the government to prove that he had "used a facility or means of interstate commerce to knowingly attempt to persuade, induce, or entice an individual to engage in sexual activity." But the elements instruction did not require proof—expressly or otherwise—that McLain had intended to engage in sexual activity with a minor. It is therefore difficult to see how a jury could have been confused by these two instructions. Accordingly, the district court did not abuse its discretion by providing the intent instruction to the jury.

**E. Cumulative Impact**

Finally, McLain submits that the four purported errors taken together prejudiced his right to a fair trial. To

demonstrate cumulative error, McLain must show that at least two errors were committed during the trial and that these errors denied him a fundamentally fair trial. *See United States v. Conner*, 583 F.3d 1011, 1027 (7th Cir. 2009). We recognize that the alleged errors all bear to some degree on the disputed issue of McLain's intent with respect to Codey. But we conclude that these errors (assuming they were errors), considered together, were not "so severe as to have rendered his trial fundamentally unfair." *United States v. Powell*, 652 F.3d 702, 706 (7th Cir. 2011). The evidence here overwhelmingly supported McLain's guilt. Accordingly, none of the errors, either individually or cumulatively, could have affected the verdict. *See id.* at 707 (finding no cumulative error "[i]n light of the quantity and quality of evidence of [the defendant's] guilt adduced at trial").

### III

For the foregoing reasons, we AFFIRM the judgment of the district court.

RIPPLE, *Circuit Judge*, dissenting.

My colleagues have written a thorough and thoughtful opinion. Their statement of the facts is correct, and their rendition of the law is correct. I regret that I cannot agree on their application of the applicable legal principles to the facts and therefore respectfully dissent.

In my view, the district court should have permitted the jury to evaluate the expert testimony of Dr. Wilson. That testimony was relevant and probative on the issue of intent and, subject to cross-examination, posed little threat of jury confusion. I also believe that the remark of the prosecutor in rebuttal closing argument was beyond the pale and that the district court's attempt to cure this unfortunate utterance was far too feeble.

Finally, I cannot join the panel's alternative of relying on harmless error. Indeed, the present case is a good example of our over-reliance on this doctrine. True, there are no perfect trials, only fair trials, but we should be more careful about declaring an error harmless when that error restricts or infects the role of the jury.

Accordingly, I would reverse the judgment of the district court and remand for further proceedings.