**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Craig MEADOWS, Defendant–Appellant.**

No. 95–3629.

United States Court of Appeals, Seventh Circuit.

Argued April 23, 1996.

Decided July 26, 1996.

Tina L. Nommay, Andrew Baker (argued), Office of U.S. Atty., Fort Wayne, IN, for Plaintiff–Appellee.

P. Stephen Miller, (argued), Fort Wayne, IN, for Defendant–Appellant.

Before FLAUM, MANION, and EVANS, Circuit Judges.

MANION, Circuit Judge.

Craig Meadows was convicted of possession of a firearm not registered to him in the National Firearms Registration and Transfer Record (26 U.S.C. § 5861(d)), and possession of a firearm made in violation of the provisions of U.S.C. Title 26, Chapter 53 (26 U.S.C. § 5861(c)). Upon conviction, he was sentenced to two concurrent terms of twenty-seven months in prison. The firearm in question was alleged to be a rifle having a barrel of less than 16 inches in length, a firearm as defined by 26 U.S.C. §§ 5845(a)(3) and 5845(c). In this timely appeal, Meadows argues that the conviction represents a manifest miscarriage of justice, because there was

no evidence that the weapon in question met certain elements of the statutory definition of a rifle in 26 U.S.C. § 5845(c). And indeed, the record does not reveal any evidence suggesting that the weapon contained "a rifled bore," one of the elements of the statutory definition of a rifle under § 5845(c). Because the government presented no proof of an essential element of the crimes, we reverse both convictions.

## I.

Officers from the Bluffton Police Department and the Wells County Sheriff's Department suspected Craig Meadows of being a marijuana grower. They obtained and executed a search warrant and apparently found growing marijuana, for which Meadows was eventually prosecuted and convicted in state court. In the process of the search the officers also came across several weapons in a gun cabinet in the living room. One of these weapons was an amateur conversion of an old Spanish revolver described by the government's expert in this case as an approximately .45 caliber "Webley double action[1] revolver that was made in Spain under contract during World War I for the British. It is a copy of a Smith & Wesson double action revolver...." At the time of his arrest, Meadows had owned the gun for close to ten years.[2] He had bought it from a flea market for thirty to thirty-five dollars. At the time of purchase it was extremely rusty, and Meadows spent a lot of time sanding off the rust. Also, the gun's grip panels (which one would use to hold the gun) were split. At some point Meadows removed the grip panels and replaced them with a handmade stock. He made the stock by tracing a shotgun stock and then cutting it out of a piece of wood. Using two screws, he attached the stock to the part of the gun from which the grip panels had been removed. Meadows

intended the gun to look like one he had seen displayed in a gun store some time earlier. He hung the finished product on the wall for a while, but because he had young children he put it in the gun cabinet in his living room with the rest of his guns. He never shot the gun or bought any ammunition for it.

All that being said, the government prosecuted him for having possession of and failing to register a firearm that was a rifle having a barrel less than sixteen inches in length, in violation of 26 U.S.C. § 5861(c) & (d). At trial, five witnesses took the stand. Two officers testified to the seizure of the weapon in question from the gun cabinet of Meadows' living room. Neither recalled finding any .45 caliber ammunition. The officers believed that the weapon was in violation of federal law, because the length of the barrel was well short of sixteen inches.[3] Accordingly, the Wells County Sheriff's Department contacted the Bureau of Alcohol, Tobacco, and Firearms (ATF). An ATF field agent testified that he received the gun from the Sheriff's Department and sent it to ATF headquarters in Washington for examination and testing. The agent also contacted the ATF's National Firearms Act Branch, where an ATF specialist searched the National Firearms Registration and Transfer Record and determined that the gun had not been registered to Meadows or his wife, and that neither Meadows nor his wife had an approved application to make the weapon under U.S.C. Title 26, Chapter 53.

Next, the ATF expert who examined the gun at ATF headquarters testified that the gun was a pistol or revolver converted into a rifle. He went through a description of the weapon and its components; one thing he did not describe was a "rifled bore." He also stated that he test-fired the weapon. Before the test-firing, he put on ear protection,

---

**1.** The ATF expert testified that "double action" means that one round can be fired by cocking the hammer and pulling the trigger and that a second round can be fired by "pulling the action through."

**2.** Meadows provided most of the testimony at trial regarding how he acquired the gun, how long he possessed it, what he did with it in the time prior to his arrest, and why he did what he did. The record does not reveal any attempt by

the government to prove that Meadows was lying about any aspects of his testimony.

**3.** According to the testimony of the ATF expert who later examined the gun, the barrel measured approximately five inches in length. Meadows testified on cross-examination that, including the chamber, the barrel appeared to be about six inches long.

heavy eye protection, and a face shield, because the testing of such weapons is "very dangerous." The ATF expert successfully fired two rounds from the gun. However, the stock cracked during the test firing; afterwards, the ATF expert wrapped tape around the stock to hold the pieces together. The expert did not recall whether the stock was loose (*i.e.*, did not sit tight against the gun) after the test-firing.[4]

As the last witness, Meadows testified about how he bought the weapon and what he did to convert it. According to Meadows, he simply thought he had a gun that he could display as a model. He never had or bought any ammunition to fire out of the revolver. He believed that the gun would be dangerous to fire, for several reasons: a gun as old as this might blow up in the user's face; the projectile might come out the side of the gun (or the gun might blow up) because the chamber did not lock and did not line up correctly with the barrel;[5] and the gun might "bust" because modern .45 caliber ammunition is more powerful than the World War I era ammunition the gun was designed to use.

The jury convicted Meadows of possession and failure to register the weapon. The question before us is whether the government proved its case.

## II.

In reviewing a sufficiency of the evidence challenge that has been preserved below, the question is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Meadows concedes that he failed to move for a judgment of acquittal under Fed.R.Crim.P. 29, and that he therefore forfeited any challenge on appeal to the

sufficiency of the evidence absent "a manifest miscarriage of justice." *United States v. Archambault*, 62 F.3d 995, 998 (7th Cir.1995) (quoting *United States v. Baker*, 40 F.3d 154, 160 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1383, 131 L.Ed.2d 237 (1995)). In the context of a challenge to the sufficiency of the evidence, "manifest miscarriage of justice" is simply another way of describing "plain error" under Fed.R.Crim.P. 52(b). *See Carlisle v. United States*, —— U.S. ——, ——, 116 S.Ct. 1460, 1471, 134 L.Ed.2d 613 (1996) (Ginsburg, J., concurring) (a defendant who fails to make a timely motion to the district court under Fed.R.Crim.P. 29 may challenge the sufficiency of the evidence on appeal "subject to 'plain error' standard"); *Clyatt v. United States*, 197 U.S. 207, 221–22, 25 S.Ct. 429, 432–33, 49 L.Ed. 726 (1905) (citing *Wiborg v. United States*, 163 U.S. 632, 658, 16 S.Ct. 1127, 1137, 41 L.Ed. 289 (1896)). Our court has stated that when the defendants have failed to challenge the sufficiency of the evidence before the district court, "we review only for plain error, and defendants must demonstrate a manifest miscarriage of justice." *United States v. Goulding*, 26 F.3d 656, 663 (7th Cir.) (citation omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 673, 130 L.Ed.2d 605 (1994). Moreover, as to errors in general which the defendant has not raised to the trial judge, our court has held that we will reverse for plain error only when we are "convinced that it is necessary to avert an actual miscarriage of justice." *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir. 1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). Our court has also determined that "[i]n order to constitute plain error, the alleged error must result in a 'miscarriage of justice' of such magnitude that the defendant probably would have been acquitted absent the error." *United States v. Valencia*, 907 F.2d 671, 685 (7th Cir.1990) (quotation omitted); *accord* Silverstein, 732 F.2d at 1349 ("an actual miscarriage of justice . . . implies the conviction of one who but

---

4. The stock was loose by the time the gun was entered into evidence. The ATF expert testified to his recollection that the stock was "pretty tight" when he received the gun. By contrast, Meadows testified that he could not get the stock to "sit solid" against the gun. He further stated that "[i]t wasn't quite that bad, but it did move."

5. However, the ATF expert testified that the chamber must have lined up correctly with the barrel when he tested the gun, because the gun fired two rounds successfully.

for the error probably would have been acquitted.").

■ The Supreme Court explained the meaning of plain error in *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). "Plain error" under Fed.R.Crim.P. 52(b) means an "error" that is "plain," "affects substantial rights," and "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 730–37, 113 S.Ct. at 1776–79. An error is a "[d]eviation from a legal rule." *Id.* at 732–33, 113 S.Ct. at 1777. In the context of sufficiency of the evidence, the error is the failure of the district court "of its own motion" to order a judgment of acquittal when the evidence is insufficient to sustain a conviction. *See* Fed.R.Crim.P. 29(a) ("The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal ... if the evidence is insufficient to sustain a conviction of [the] offense or offenses."). We do not review the sufficiency of the evidence *de novo* when there was no objection at trial; it must be "plain" (*i.e.*, clear or obvious) that there was insufficient evidence. *See Olano*, 507 U.S. at 732–34, 113 S.Ct. at 1777. The trial court's failure to enter a judgment of acquittal must also have "affected substantial rights"—*i.e.*, "affected the outcome of the District Court proceedings." *Id.* at 734, 113 S.Ct. at 1778. This is true by definition when the court should have entered a judgment of acquittal rather than a judgment of conviction. Finally, the error must "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736, 113 S.Ct. at 1778–79. *Olano's* requirements for plain error are met with respect to sufficiency of the evidence claims "if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *United States v. Wright*, 63 F.3d 1067, 1072 (11th Cir.1995) (quotations omitted); *United States v. Laury*, 49 F.3d 145, 151 (5th Cir.) (quotation omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 162, 133 L.Ed.2d 105 (1995); [6] *see also Beckett v. United States*, 379 F.2d 863, 864 (9th Cir.1967) (finding a manifest miscarriage of justice where "there was no proof of one of the essential elements" of the crimes charged).

## III.

■ Applying the plain error standard, in reviewing Meadows' conviction for sufficiency of the evidence, there would be a manifest miscarriage of justice if the government failed to present any evidence on an essential element of the crime. Meadows relies on the holding of *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), that the government is "required to prove beyond a reasonable doubt that he knew the weapon he possessed had the characteristics that brought it within the statutory definition" of a particular type of firearm. *Id.* at ——, 114 S.Ct. at 1795. Indeed, *Staples* emphasizes that a conviction for possession of guns in general cannot "rest simply on proof that a defendant knew he possessed a 'firearm' in the ordinary sense of the term," as the government had argued to the Court. *Id.* at ——, 114 S.Ct. at 1798. Instead, the question before the Court was whether the government must prove that the defendant knew "of the particular characteristics that make his weapon a statutory firearm." *Id.* at ——, 114 S.Ct. at 1799. The Court concluded that to obtain a conviction the government is required to prove that the defendant "knew of the features of his [weapon] that

---

6. The Fifth Circuit has questioned whether this plain error standard is distinguishable from the sufficiency of the evidence standard employed if the defendant does make a proper motion for acquittal to the district court. *Laury*, 49 F.3d at 151 n. 15 (citing *United States v. Pennington*, 20 F.3d 593, 597 n. 2 (5th Cir.1994)). Under the *Jackson v. Virginia* test for sufficiency of the evidence, an appellate court will reverse if, after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt. *United States v. Ellis*, 50 F.3d 419, 422 (7th Cir.) (quotation omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 143, 133 L.Ed.2d 89 (1995). We need not decide in the case before us precisely how much worse a situation must be to cross the line from merely insufficient evidence to a manifest miscarriage of justice. Certainly, though, a complete lack of any evidence of one of the essential elements of a crime is not only insufficient evidence, but too little evidence to avoid a manifest miscarriage of justice.

brought it within the scope of the Act." *Id.* at ——, 114 S.Ct. at 1804.

■ Under the rule in *Staples,* the government had to prove that Meadows knew that his weapon had every characteristic of the statutory definition of a firearm. Thus, if the government failed to introduce any evidence that Meadows knew of one of the essential characteristics contained in the statutory definition of the weapon he possessed, he should have been acquitted. To have been convicted without such evidence would be a manifest miscarriage of justice.[7] In Meadows' case, the relevant statutory definition provides as follows:

> The term "rifle" means a weapon *designed or redesigned, made or remade, and intended to be fired from the shoulder* and *designed or redesigned and made or remade* to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a *rifled bore* for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

26 U.S.C. § 5845(c) (emphases added).

Meadows focuses first on the requirement that he knew that the weapon was "designed or redesigned, made or remade, and intended to be fired from the shoulder." We cannot conclude that there was no evidence of these aspects of the statutory definition; however, we note that there was not much evidence of these elements either. The weapon dated from the World War I era, and was apparently not in especially good condition. There was no evidence that Meadows ever bought any ammunition for it or that he ever fired it. Meadows testified to his belief that firing the gun would be dangerous to the person doing the firing. The ATF expert testified to the same effect, and also explained how he took precautions for his safety before test-firing the weapon. The wooden stock that Meadows had added to the weapon, which seemingly would allow the weapon to be fired from the shoulder, cracked when the weapon was test-fired by the ATF expert. In these circumstances, we doubt that Meadows knew that this weapon was "designed or redesigned, made or remade, and intended to be fired from the shoulder," as opposed to being a mere conversation piece or collector's item. Although these are close questions, they alone do not reach the level of plain error.

But if the government is going to prosecute someone who purchased a gun that is barely usable, held it for ten years without ever purchasing bullets, and apparently never fired or intended to fire it, it had better prove every element of the statute. In Meadows' case, the government failed to prove, as required by the statute, that the weapon fired a single projectile through "a rifled bore" for each single pull of the trigger. To begin with, there was no evidence presented that the weapon contained "a rifled bore," much less that Meadows knew it.

The term "rifled" is derived from the verb "to rifle," which means "to cut spiral grooves into the bore of (as a firearm or piece of ordnance)." *Webster's Third New International Dictionary* 1954 (1986).[8] *Webster's* does define a "rifle" as "a firearm having a rifled bore and intended to be fired from the shoulder." *Id.* However, by contrast, it does not define a "pistol" or a "revolver" as containing a rifled bore. *Id.* at 1724, 1945. In fact, according to another provision of the definitional statute at issue, a pistol or a revolver may contain either a smooth bore or a rifled bore. 26 U.S.C. § 5845(e). As the government's expert testified, the weapon was really an old pistol or revolver, one that was converted into a "rifle" by the addition of

---

7.  *United States v. Starkes,* 32 F.3d 100 (4th Cir. 1994) (per curiam), suggests that where the jury instructions are incorrect under *Staples,* a Court of Appeals should reverse and remand for a new trial, rather than examine the sufficiency of the evidence. *See id.* at 101. Assuming *arguendo* that *Starkes* is correct, a remand for a new trial would nevertheless be inappropriate in Meadows' case, because the district court gave satisfactory instructions on *mens rea.* For both counts, the instructions required proof beyond a reasonable doubt that "the defendant possessed and knew he possessed a firearm that had the features to bring it within the scope of the Act, namely that it was a rifle with a barrel of less than 16 inches in length." The instructions then defined "rifle" using the language of § 5845(c).

8.  The grooves of a rifled bore cause the bullet or projectile to rotate and thus increase the accuracy of the shot.

a stock in place of the normal grip panels. The weapon possessed by Meadows, either in its original ("pistol" or "revolver") or modified ("rifle") state, may have contained either a smooth bore or a rifled bore. The record nowhere indicates which.

The word "rifle" was used often during the testimony. However, no one testified that this so-called "rifle," converted from what witnesses called a "pistol" or "revolver," had "a rifled bore." The closest that a witness came to saying the weapon contained a "rifled bore" was when the ATF expert agreed with the prosecutor's statement on redirect examination that Meadows' weapon will "expel with every pull of the trigger a single projectile through the *rifle bore*." However, while the use of the term "rifle bore" might have misled jurors into believing that the element of a "rifled bore" had been proved, it is clear that the ATF expert was merely indicating that the projectile would travel through the bore of the "rifle" (the layman's term for the weapon under discussion). There was no indication in the testimony that the bore was rifled, or that rifling was present in the bore.

At oral argument the government admitted that no one testified that the barrel was rifled or explained what "rifled" meant. Nevertheless, the AUSA surmised that the members of the jury could have looked down the barrel and seen that it was grooved or rifled. But why would the jurors have bothered to look down the barrel to determine if the bore was "rifled," if they had no explanation of what "rifled" meant? We do not see why a jury would look for a feature of the weapon that neither the parties, the witnesses, nor the judge suggested that the jury should examine.

Since there was neither any testimony about a rifled bore, nor any reason for the jury to discover this characteristic in its own observation, we must conclude that there is a complete gap in the evidence regarding this element. Both of Meadows' convictions required proof that Meadows knew that his weapon contained every characteristic of the statutory definition of a "rifle" under § 5845. To allow the convictions to stand would be a miscarriage of justice.

## IV.

Apparently the government simply overlooked the "rifled bore" element when proving its case. But this is not a harmless oversight. The old pistol that Meadows converted may well not have had a rifled bore. If not, he could not have been convicted under the statute. Failure to prove this essential element was plain error. The judgment is REVERSED, and the case REMANDED with instructions to enter a judgment of acquittal on both counts of the indictment.