In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 24-1910 & 24-2310

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TONYA ROBINSON and ALBERT SMITH,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for
the Northern District of Indiana, South Bend Division.
No. 3:21-cr-00064-JD-MGG — **Jon E. DeGuilio,** *Judge.*

_____

ARGUED OCTOBER 27, 2025 — DECIDED DECEMBER 15, 2025

AS AMENDED ON PETITION FOR REHEARING JANUARY 28, 2026

_____

Before EASTERBROOK, ROVNER, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Tonya Robinson and Albert Smith held leadership roles at the Housing Authority of South Bend, an institution dedicated to providing affordable housing in the local community. Instead of helping their tenants, Robinson and Smith used their positions to enrich themselves through a kickback scheme. They hired contractors to

perform fictional maintenance work on Housing Authority properties and then took a cut of the payments for those projects. A jury convicted them of wire fraud and bank fraud, among other federal crimes. We affirm the wire fraud convictions but reverse the bank fraud convictions because the government failed to identify a false statement that went to a bank, as required by 18 U.S.C. § 1344(2).

## I

### A

The United States Department of Housing and Urban Development funds certain local housing authorities who provide affordable housing in communities. The Housing Authority was one of those institutions. It acted as a landlord for over 800 homes rented to residents in South Bend, Indiana. The Housing Authority used employees to handle small maintenance on the buildings. But it turned to outside contractors for larger projects, like renovating its properties between tenants. And it would often use money from HUD to fund those larger projects. Rather than receiving money in one lump sum, the Housing Authority would file a drawdown request on an ongoing, as-needed basis. HUD would then electronically transfer money to the Housing Authority if it approved of the distribution.

The Housing Authority followed certain procedures when working with outside contractors. It would first choose a contractor for the project through a bidding process. The contractor would finish its work and submit an invoice to the Housing Authority. Employees would inspect the work, approve the invoice, and submit the invoice internally for payment. The Housing Authority bookkeeper would in turn draft a

check for the contractor and submit that check to the Executive Director for approval. The Executive Director would approve the payment, and the bookkeeper would finally mail the check to the contractor.

Around 2015 Executive Director Tonya Robinson and Asset Director Albert Smith began deviating from these procedures through a kickback scheme. The scheme worked in a few steps. The contractors first submitted invoices for work never completed, with Robinson and Smith taking steps to help those invoices receive approval for payment. The contractors then cashed the checks paying for these bogus invoices and split the money with Robinson and Smith. Several contractors participated in the scheme.

Robinson and Smith stayed under the radar until 2016. That ended when a worker at the Four Winds Casino in South Bend saw them gambling large sums of money and decided to tip off law enforcement. The government quietly investigated the Housing Authority's operations until July 2019, when it began executing search warrants and interviewing witnesses. One contractor admitted bringing kickback payments to Smith. Federal charges then followed against Robinson, Smith, and others.

Count 1 charged Robinson and Smith with conspiracy to commit bank and wire fraud (18 U.S.C. § 1349), Counts 2–7 charged them with bank fraud (18 U.S.C. § 1344(2)), Counts 8 and 9 charged them with wire fraud (18 U.S.C. § 1343), and Count 10 charged them with federal program theft (18 U.S.C. § 666(a)(1)(A)).

B

Robinson and Smith proceeded to trial. At the close of the government's case, Smith moved for a judgment of acquittal as to the wire fraud charges in Counts 8 and 9, and Robinson did the same for Count 8. The district court took the motion under advisement. Robinson and Smith then presented their defense. The jury returned a mixed verdict as to Robinson, acquitting her on Count 9 but convicting her on everything else. It convicted Smith on all counts. Robinson and Smith renewed their motion for a judgment of acquittal. The district court denied the motion as to Count 8. And it did the same for Smith's conviction on Count 9. Robinson and Smith never challenged their bank fraud convictions.

The district court later sentenced Robinson to 108 months' imprisonment on Counts 1–8 and 10 to be served concurrently and ordered her to pay $3,236,949.97 in restitution. Smith received a sentence of 135 months on Counts 1–9 and 120 months for Count 10 to be served concurrently, with restitution of $3,030,940 also imposed.

Robinson and Smith now appeal.

**II**

A

We begin with Robinson and Smith's challenges to the sufficiency of the evidence of their bank fraud convictions. Section 1344(2) makes unlawful the execution or attempted execution of "a scheme or artifice … to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2).

The government offered a straightforward theory of criminal wrongdoing at trial. It presented several invoices approved by the Housing Authority detailing work purportedly performed at various properties. The tenants at those properties then testified that the work described in the invoices never occurred. The trial evidence also included six checks issued by the Housing Authority to pay these fraudulent invoices. And the prosecution insisted that Robinson, Smith, and their co-conspirators knowingly executed and attempted to execute their kickback scheme when contractors presented those checks to the bank for payment.

Robinson and Smith never challenged their bank fraud convictions below. We have traditionally applied the plain error standard to sufficiency-of-the-evidence challenges raised for the first time on appeal. See *United States v. Meadows*, 91 F.3d 851, 854–55 (7th Cir. 1996). That standard requires showing "(1) an error, (2) that was plain, (3) that affected [the defendant's] substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the proceedings." *United States v. Jones*, 22 F.4th 667, 675 (7th Cir. 2022). All four prongs are necessary. See *United States v. Page*, 123 F.4th 851, 864 (7th Cir. 2024) (en banc). Judge Easterbrook contends that the government forfeited the benefit of plain error review by ignoring the specific elements of the doctrine. But its brief invoked the standard in no uncertain terms, so we will assess all four prongs.

B

Starting with prong one, we have called it error when a district court fails "of its own motion to order a judgment of acquittal" under Federal Rule of Criminal Procedure 29(a) where "the evidence is insufficient to sustain a conviction."

*Meadows*, 91 F.3d at 855 (cleaned up). That view used to make sense because Rule 29(a) once included mandatory language, providing that a court "on motion of a defendant or of its own motion *shall* order the entry of judgment of acquittal" absent sufficient evidence. Fed. R. Crim. P. 29(a) (1996) (emphasis added). But Rule 29(a) changed in 2002 and now uses permissive language, saying that a court "*may* on its own consider whether the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a) (emphasis added). District courts do not obviously err by declining to exercise a discretionary power.

Judge Easterbrook's concurrence suggests this textual change may shield district courts from being reversed under plain error review for failing to acquit a defendant on their own motion. But we need not resolve that question because the government expressly invoked *Meadows* for the proposition that district courts must take such corrective action in the face of insufficient evidence. We treat this as a concession and proceed with the remainder of the plain error analysis.

C

Moving to prong two, we conclude that the district court plainly erred by failing to acquit Robinson and Smith on the bank fraud convictions. To commit bank fraud, "[t]he criminal must acquire (or attempt to acquire) bank property 'by means of' the misrepresentation." *Loughrin v. United States*, 573 U.S. 351, 362–63 (2014) (discussing 18 U.S.C. § 1344(2)). The "by means of" language, the Supreme Court has emphasized, "demands that the defendant's false statement [be] the mechanism naturally inducing a bank … to part with its money." *Id.* at 365. This requirement limits § 1344(2)'s scope "to deceptions that have some real connection to a federally insured bank." *Id.* at 366. "[W]here no false statement will

ever go to a financial institution, the fraud is not the means of obtaining bank property." *Id.* at 365.

The government never identified a false statement that went to any bank. To be sure, it presented evidence that Robinson and Smith engaged in fraud in a general sense. For example, one contractor testified that he and Robinson both created false invoices for some kickback checks. The same witness suggested that Smith fabricated false invoices as well. But nothing showed that the bank received these false statements, so they cannot support the bank fraud convictions.

The Supreme Court contemplated a scheme like this in *Loughrin*. It explained that a swindler could sell a knock-off Louis Vuitton handbag to an unsuspecting victim without committing bank fraud even if the victim were to pay by check. See *id.* at 361–62, 364–65. It reasoned that "[n]o one would dream of passing on to the bank" any misrepresentation made to the victim about the bag's authenticity. *Id.* at 364. The bank's involvement in that scheme would be "wholly fortuitous—a function of the victim's paying the fraudster by (valid) check rather than cash." *Id.*

The same is true here. Robinson and Smith engaged in a scheme to defraud the Housing Authority and HUD. They made false representations so that the Housing Authority would cut checks to their co-conspirator contractors. But they did not engage in bank fraud just because a victim paid by check. *Loughrin* forecloses holding otherwise.

The government resists this conclusion. It insists the Supreme Court's handbag hypothetical is different because the swindler completes his con the moment the victim hands him the check, whereas Robinson and Smith had to wait to receive

kickback payments from their co-conspirator contractors. But patience does not convert a kickback scheme into bank fraud. And the government never explains why the intermediate step implies that a false statement went to the bank.

The government also contends the checks implicitly represented that the Housing Authority authorized Robinson and Smith to complete these transactions to fund the kickback scheme. That representation would be false because the Housing Authority only approved these transactions to pay for purported work. But "a check is not a factual assertion at all." *Williams v. United States*, 458 U.S. 279, 284 (1982). Just as the check paid to the handbag swindler did not represent that the victim approved of receiving a fake Louis Vuitton, see *Loughrin*, 573 U.S. at 364–65, so too did the Housing Authority's checks fail to communicate an institutional blessing of the kickback scheme.

D

Robinson and Smith satisfy prongs three and four of the plain error test as well. The third prong requires showing that the error affected substantial rights. See *Jones*, 22 F.4th at 675; Fed. R. Crim. P. 52(b). An error affects substantial rights when "a reasonable probability exists that, but for the error, the outcome of the proceedings would have been different." *Page*, 123 F.4th at 867. This is true where, as here, the defendant "would have been acquitted absent the error." *United States v. Boswell*, 772 F.3d 469, 477 (7th Cir. 2014).

The fourth prong requires showing that the error seriously affected the fairness, integrity, or public reputation of the proceedings. See *Jones*, 22 F.4th at 675. This effect "is usually equated to causing a miscarriage of justice." *United States v.*

*Paladino*, 401 F.3d 471, 481 (7th Cir. 2005) (cleaned up). That occurs when there is "a substantial risk of convicting an innocent person." *United States v. Maez*, 960 F.3d 949, 962 (7th Cir. 2020). This case fits the bill.

We used to hold that "an error that results merely in a concurrent sentence" does not amount to a miscarriage of justice. *United States v. McCarter*, 406 F.3d 460, 464 (7th Cir. 2005); see also *United States v. Baldwin*, 414 F.3d 791, 796 (7th Cir. 2005). But we have since overruled that position, including our holdings in *McCarter* and *Baldwin*, because convictions themselves can also result in adverse collateral consequences. See *United States v. Parker*, 508 F.3d 434, 436, 441 (7th Cir. 2007). Judge Easterbrook's concurrence suggests that our court may want to revisit that position because our vacating Robinson and Smith's bank fraud convictions does not alter their term of imprisonment and instead only relieves them of the relatively minor financial obligation of paying special assessments on those convictions. Neither party raised this issue. So we will wait for another day to grapple with Judge Easterbrook's broader point about the application of the plain error doctrine to circumstances like these and, by extension, the ongoing soundness of our holding in *Parker*.

For these reasons, we reverse Robinson and Smith's bank fraud convictions and direct the district court to enter a judgment of acquittal and to amend its judgment consistent with this opinion.

### III

### A

Robinson and Smith fare less well in their challenge to the sufficiency of the evidence for their wire fraud convictions

under Count 8. Section 1343 punishes anyone who "transmits or causes to be transmitted by means of wire … any writings, signs, signals, pictures, or sounds for the purpose of executing" "any scheme or artifice to defraud" or to obtain "money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. "To establish a violation of that statutory provision, the Government must prove that [the defendant] (1) participated in a scheme to defraud; (2) intended to defraud; and (3) caused an interstate wire to be used in furtherance of the scheme." *United States v. Gustafson*, 130 F.4th 608, 614 (7th Cir. 2025).

The government alleged that Robinson and Smith caused an $80,000 drawdown to be transmitted from HUD to the Housing Authority on September 22, 2017 to further the kickback scheme. It told the jury during closing argument that this drawdown furthered the scheme by adding money to the same bank account used to finance the kickback checks. The trial evidence also showed that the Housing Authority paid for a pending fraudulent invoice after completing the drawdown. But the prosecution never tracked a specific drawdown dollar to a kickback check.

B

Robinson and Smith dispute that the September 2017 drawdown furthered the kickback scheme. They raised this challenge below, and the district court denied their motion for a judgment of acquittal. We review the denial without deference, viewing the evidence in the light most favorable to the government. See *United States v. Jackson*, 5 F.4th 676, 682 (7th Cir. 2021). Our analysis "is limited, however, to the legal question [of] whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up). We will "overturn a district court's Rule 29 denial only if no rational trier of fact could have found the defendant guilty, a burden for defendants that we have described as nearly insurmountable." *Id.* at 682 (cleaned up).

Based on the evidence at trial, a rational jury could have inferred that a portion of the September 2017 drawdown went to pay for outstanding fraudulent invoices. The government, for example, offered an invoice from a company named D Fresh Contractors for $12,300 of work performed in South Bend. That invoice appears to have been fraudulent based on the tenant's testimony. And the timing of the Housing Authority's actions suggests that it may well have used the September 2017 drawdown to cover the bill. It received the invoice on August 31, 2017. It completed its drawdown on or about September 22, 2017. Then it wrote a $12,300 check to the owner of D Fresh Contractors on November 9, 2017. He deposited the check and withdrew $12,300 on November 14, 2017. This evidence supports the inference that the drawdown furthered the kickback scheme. See *United States v. Grandinetti*, 891 F.2d 1302, 1306 (7th Cir. 1989) ("A jury is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference." (cleaned up)).

Robinson and Smith insist otherwise. They identify five more drawdowns that occurred between September 22 and November 14, 2017. And they contend these were equally likely to have been the funding source for the kickback check cashed on November 14. See *United States v. Vizcarra-Millan*, 15 F.4th 473, 507 (7th Cir. 2021) ("Where the jury is left with

two equally plausible inferences from the circumstantial evidence, guilty or not guilty, it must necessarily entertain a reasonable doubt."). But the government provided additional information making the guilty inference more plausible. It demonstrated that between the September 2017 drawdown and the next drawdown, the Housing Authority issued over $150,000 in checks to the co-conspirator contractors, and those contractors immediately cashed more than $90,000. So the jury did not need to entertain a reasonable doubt as to whether the September 2017 drawdown furthered the scheme.

Robinson and Smith also tell us that *United States v. Durham*, 766 F.3d 672 (7th Cir. 2014), stands for the proposition that a jury cannot assume that a wire furthers a scheme to defraud when documentation of that wire's purpose exists and the government fails to introduce it at trial. They see that rule applying here because a witness testified at trial that HUD put the Housing Authority on "zero tolerance" for the entire life of the scheme, meaning that the Authority had to provide the agency with the scope of work for each drawdown. In short, Robinson and Smith take issue with the government's failure to provide the jury with records specifying the scope of work for the September 2017 drawdown.

But the jury did not have to believe that such a document existed. After all, another witness could not remember if the Housing Authority was on zero tolerance. And Robinson's counsel highlighted in his closing reasons to doubt the government witness's credibility, including his failure to preserve records for a HUD audit. Even more, *Durham* did not require the government to introduce every existing piece of documentary evidence of a wire's purpose. It merely faulted

the government for forgetting to provide any purpose evidence at all. 766 F.3d at 679. We have already identified evidence sufficient for a reasonable jury to infer that the September 2017 drawdown furthered the kickback scheme. So *Durham* does little to help Robinson or Smith.

All of this leads us to affirm Robinson and Smith's wire fraud convictions on Count 8.

## IV

That brings us to Smith's sentencing challenge. The district court applied a two-level enhancement under U.S.S.G. § 3B1.3 because it concluded he had abused a position of trust. Smith objected below and maintains his objection on appeal.

Section 3B1.3 applies if a defendant "(1) occupied a position of public or private trust; and (2) abused the position of trust to significantly facilitate or conceal the commission of the crime." *United States v. Bradshaw*, 670 F.3d 768, 770 (7th Cir. 2012). "The district court's determination in each respect is a factual one, which we review for clear error." *United States v. Peterson-Knox*, 471 F.3d 816, 825 (7th Cir. 2006). Under the clear error standard, "the district court need only adopt a *permissible* view of the evidence." *United States v. Turnipseed*, 47 F.4th 608, 615 (7th Cir. 2022). "Our task on appeal, therefore[,] is not to see whether there is any evidence that might undercut the district court's finding; it is to see whether there is any evidence in the record to support the finding." *United States v. Dickerson*, 42 F.4th 799, 804 (7th Cir. 2022) (cleaned up).

Ample evidence supports finding that Smith occupied a position of trust within the Housing Authority. "[A] 'position of public or private trust [is] characterized by professional or managerial discretion       (*i.e.*, substantial       discretionary

judgment that is ordinarily given considerable deference)[.]'"
*United States v. Tiojanco*, 286 F.3d 1019, 1021 (7th Cir. 2002)
(quoting U.S.S.G. § 3B1.3, cmt. n.1). And Smith exercised
plenty of discretion. In his role as Asset Director, he oversaw
building maintenance and renovation, which involved work-
ing with contractors and sometimes submitting their invoices
for payment. He also supervised the property managers, who
in turn occasionally approved invoices for payment.

This evidence sufficed. See, *e.g.*, *United States v. Emerson*,
128 F.3d 557, 559–60 (7th Cir. 1997) (affirming that a contract-
ing officer had a position of trust in part because he could in-
spect work sites and certify completion of work, even though
he was not authorized "to approve the payments of any in-
voices"); see also *United States v. Deal*, 147 F.3d 562, 563–64
(7th Cir. 1998) (affirming that a comptroller who could ap-
prove invoices for payment had a position of trust despite the
fact that "he was required to submit the invoices that he ap-
proved to the general manager for final approval" because
"[n]o one who is entrusted with large amounts of money is
trusted completely").

Other evidence also supports the district court's finding
that Smith facilitated the scheme by abusing his position of
trust. The jury heard testimony that he instructed the contrac-
tors on how to prepare fraudulent invoices. And one contrac-
tor suggested at trial that Smith started creating false invoices
as well. We see no clear error by the district court.

Regardless, any possible error was harmless. "[D]istrict
courts can, in essence, inoculate their sentences against rever-
sal by giving us the information we need to determine, on ap-
peal, whether an error was harmless without resort to a re-
mand." *United States v. Caraway*, 74 F.4th 466, 468 (7th Cir.

2023) (cleaned up). "Where a district court unambiguously states that it would have imposed the same sentence regardless of any potential error, the error is harmless." *Id.* The district court did that here by stating it would vary to the same sentencing range even without the enhancement because of the 18 U.S.C. § 3553(a) factors. Smith cannot get around this.

In the final analysis, we affirm Smith's sentence.

## V

One final issue warrants our attention. It appears that the district court made a minor clerical error in Robinson's written judgment. Both sides agree that the court intended to make Robinson, Smith, and contractor Archie Robinson jointly and severally liable for the $1,316,882.97 of restitution involving Archie. But the district court omitted any mention of Smith when recording (in Robinson's judgment) that Robinson and Archie were jointly and severally liable for that amount. We believe this was unintended and therefore remand on this particular issue for the limited purpose of clarifying the joint and several nature of this restitution amount.

\*\*\*

For these reasons, we REVERSE the bank fraud convictions on Counts 2–7 and direct the district court to enter a judgment of acquittal on these counts and to amend its judgment consistent with this opinion; we AFFIRM the wire fraud convictions on Count 8; we AFFIRM the district court's use of the abuse-of-trust enhancement when sentencing Smith; and we REMAND to allow the district court to clarify the joint and several nature of Robinson's restitution.

EASTERBROOK, *Circuit Judge*, concurring. The court vacates defendants' convictions for bank fraud under 18 U.S.C. §1344(2). My colleagues conclude, and I agree, that *Loughrin v. United States*, 573 U.S. 351, 362–66 (2014), undercuts these convictions: the checks were genuine instruments, written on real accounts; they did not misrepresent any fact material to a bank's decisions. The victims were the people of South Bend (and the United States, which supplied much of the money), rather than a bank.

It is hard to blame the district judge, however, because defense counsel did not draw *Loughrin* to his attention. Indeed, counsel neither moved to dismiss the bank-fraud counts of the indictment nor requested a judgment of acquittal under Fed. R. Crim. P. 29. So the first question on appeal ought to be whether defendants' argument has been preserved for appellate review.

Rule 29 is parallel to Fed. R. Civ. P. 50, which in civil cases spells out when and how a defendant may move for judgment as a matter of law, the civil equivalent to a judgment of acquittal. *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006), holds that proper use of Civil Rule 50 is essential to preserve for appellate review an argument that the evidence is insufficient. Shouldn't the same be true about Rule 29?

*Unitherm* observed that a timely motion in the district court is essential to obtain the views of the judge, who knows the record and can put the argument in context. 546 U.S. at 401. That is equally true in a criminal case. We have an appellate presentation not informed by either an exchange of views in the district court or a ruling by the judge—and, if the defense argument had been made early in the case, perhaps the

prosecutor could have responded with evidence that would have shown a statutory violation.

I recognize that decisions in this circuit have engaged in plain-error review despite the absence of Rule 29 motions. E.g., *United States v. Meadows*, 91 F.3d 851, 854 (7th Cir. 1996). Many other circuits have done the same. E.g., *United States v. Luciano,* 329 F.3d 1, 5 (1st Cir. 2003); *United States v. Williams*, 974 F.3d 320, 361 (3d Cir. 2020); *United States v. Jordan*, 544 F.3d 656, 670 (6th Cir. 2008); *United States v. Quintana-Torres*, 235 F.3d 1197, 1199 (9th Cir. 2000); *United States v. Otuonye*, 995 F.3d 1191, 1210 (10th Cir. 2021); *United States v. Green*, 818 F.3d 1258, 1278–79 (11th Cir. 2016). But in the absence of a Rule 29 motion one circuit asks only whether the record is "devoid of evidence", which it sees as a standard more rigorous than plain error. *United States v. Herrera*, 313 F.3d 882, 885 & n.* (5th Cir. 2002) (en banc). And at least one court of appeals requires a Rule 29 motion as a condition of appellate review, in the absence of a manifest miscarriage of justice (which may turn out to be the Fifth Circuit's approach by another name). *United States v. Chong Lam*, 677 F.3d 190, 200 & n.10 (4th Cir. 2012).

Some of these decisions predate *Unitherm*. As far as I can see, none of the circuits that treats a Rule 29 motion as unnecessary has tried to reconcile its position with the Supreme Court's treatment of Civil Rule 50 in *Unitherm*. At oral argument defense counsel implied that criminal cases are not affected by *Unitherm* because convictions are important to the defendants. Yet the stakes in this appeal come to $600. Defendants' custodial sentences are concurrent, and they were convicted on multiple counts other than bank fraud. Only the special assessment of $100 per bank-fraud count is at issue.

The special assessment is enough to avert mootness, see *Ray v. United States*, 481 U.S. 736 (1987), but a modest monetary judgment in a criminal prosecution may pale in comparison to the stakes of civil litigation. In *Unitherm* the judgment was $18 million. Most people strive to keep their records clean, but that desire does not justify bypassing the rules for conducting litigation. Courts routinely enforce Fed. R. Crim. P. 12(b), (h), which specify the timing of certain motions by criminal defendants.

What one could say for making a distinction is that criminal judgments are subject to collateral attack, while civil judgments are not. The omission of an essential Rule 29 motion could lead to a contention under 28 U.S.C. §2255 that the lawyer furnished ineffective assistance of counsel. That may require an evidentiary hearing to explore counsel's thinking and consume unnecessary time of both district judges and appellate judges, time that could be saved by resolving the subject on direct appeal. It isn't clear that §2255 would be available to our defendants, because §2255(a) makes that remedy available only to a person claiming a right to be released—and, as I've mentioned, the stakes here concern money rather than custody. But simple rules often are the best rules, and a rule allowing direct appellate review of evidentiary arguments is simple and will prevent problems in cases that do concern custody.

We need not decide today whether Criminal Rule 29 should be treated differently from Civil Rule 50, because the United States has ignored this subject. The prosecutor's appellate brief does not cite *Unitherm* or contend that the absence of a Rule 29 motion is significant. To the contrary, the brief concedes that review for plain error is appropriate. The

norm of party presentation, see *Clark v. Sweeney*, No. 25–52 (U.S. Nov. 24, 2025); *United States v. Sineneng-Smith*, 590 U.S. 371 (2020), leads me to accept the prosecutor's concession.

The prosecutor proceeds as if a shortfall in evidence automatically demonstrates plain error. In other words, the brief for the United States equates "plain error" under Fed. R. Crim. P. 52(b) with "error". That isn't remotely correct.

The plain-error doctrine has four elements, each essential. First, there must be an error. Second, the error must be "plain" (clear or obvious). Third, the error must affect the defendant's "substantial rights." Fourth, because Rule 52(b) is permissive rather than mandatory, "even if a defendant meets the first three threshold elements of plain error, we may grant relief, in our discretion, only if the error had a serious effect on the fairness, integrity, or public reputation of judicial proceedings." *United States v. Page*, 123 F.4th 851, 868 (7th Cir. 2024) (en banc). *Page* restates law established by *United States v. Olano*, 507 U.S. 725 (1993), and multiple later decisions by the Supreme Court. Under *Greer v. United States*, 593 U.S. 503 (2021), the defense bears the burden of persuasion on all four elements but has not attempted to carry that burden (or even acknowledge it) on this appeal. Yet the brief for the United States ignores *Greer*, *Olano*, its other successors in the Supreme Court, and our en banc decision in *Page*.

The first question under *Olano* and *Page* is whether the district court committed an error. I can't see one. Because the defense never asked the judge to dismiss the indictment or enter a judgment of acquittal, the district court didn't have even the *opportunity* to commit an error. Given the holding of *Johnson v. United States*, 520 U.S. 461, 467–68 (1997), that the plain-error doctrine must be evaluated using the law established at

the time of appeal, we cannot insist that the error be clear when the district judge acted. Here, however, the judge did not act at all, except by imposing sentence on the jury's verdict, and it is hard to call that an error. (Note how this assessment overlaps the point about Rule 29 and *Unitherm*.) I recognize that a failure to object to a factual error at sentencing does not block plain-error review, see *Davis v. United States*, 589 U.S. 345 (2020), but the absence of *any* engagement in the district court about the sufficiency of the evidence seems to me a basic problem.

Our decision in *Meadows* said that district judges err by not entering acquittals on their own motion. A former version of Rule 29 may have imposed that burden on district judges, but the current version does not. The rule now *permits* judges to enter *sua sponte* acquittals but does not *require* that step. No requirement, no error.

If there was an error, it is plain given *Loughrin*. But I doubt that it affects defendants' substantial rights. Unwarranted time in prison affects substantial rights, but a $600 penalty does not. The only part of defendants' sentences that is not concurrent is the special assessment, and that modest sanction cannot be deemed "substantial" on any plausible understanding of the word. Defendants do not contend that the bank-fraud convictions affected their offense level under the Sentencing Guidelines, leaving only monetary stakes.

Criminal convictions carry collateral consequences, but do extra convictions add to these consequences? Collateral consequences of defendants' scheme, such as disqualification from jury service and potentially losing the vote, will occur because of felony convictions that we hold proper. Appellants

do not contend that the bank-fraud convictions carry *extra* collateral consequences.

Finally, the bank-fraud convictions do not have "a serious effect on the fairness, integrity, or public reputation of judicial proceedings." Defendants had a fair trial, and their punishment is amply warranted. Vacating convictions based on arguments never made in the district court does more to call the judicial system into disrepute than would affirming these scoundrels' convictions.

Still, because the United States has ignored the elements of the plain-error doctrine and argued only that the evidence is sufficient, the party-presentation principle dominates. The prosecutor has forfeited the benefit of *Olano* and *Page*. This leads me to join the court's opinion in full.